SCM CORPORATION

v.

The UNITED STATES.

No. 6–76.

United States Court of Claims.

March 11, 1981.

Louis W. Brydges, Waukegan, Ill., Atty. of record, for plaintiff; Brydges, Risenborough, Morris, Franke & Miller, Waukegan, Ill., of counsel.

Elizabeth Langer, Washington, D. C., with whom was Acting Asst. Atty. Gen., Thomas S. Martin, Washington, D. C., for defendant.

Before NICHOLS, BENNETT and SMITH, Judges.

## ON PLAINTIFF'S MOTION TO DISMISS AND DEFENDANT'S MOTION FOR JUDGMENT

PER CURIAM:

This case comes once again before us, this time on plaintiff's motion to dismiss its petition and defendant's opposition thereto, and defendant's motion for judgment and adoption of the trial judge's opinion in its favor. The convoluted history of this case is set forth in an order of September 19, 1980, which terminated the suspension of proceedings which had followed the filing of Trial Judge Philip R. Miller's recommended opinion of June 15, 1979. That order also set September 19, 1980, as the date from which the time period for filing a request for review of the trial judge's opinion under Ct.Cl. Rule 54(b)(3)(i) was to run. That time has expired without either party requesting review and so defendant now moves that we adopt the trial judge's opinion as the basis for our judgment. Plaintiff has not responded to defendant's motion and its own motion to dismiss its petition is but a sentence long and offers no reason therefor. We interpret plaintiff's motion to mean that it wishes to dismiss its petition without prejudice. However, since we have read and considered the trial judge's opinion and agree with his resolution of the case, we will adopt it as the basis for our judgment. Accordingly, defendant's motion is granted and plaintiff's motion is denied. The petition is dismissed with prejudice.

### OPINION OF THE TRIAL JUDGE *

MILLER, *Trial Judge*: Plaintiff seeks review of a decision of the Armed Services Board of Contract Appeals (ASBCA) (78–1 BCA ¶ 13,127) holding that plaintiff is not entitled to reimbursement of its costs under a cost-plus-incentive fee contract with the U.S. Army until plaintiff rescinds its refusal to permit government auditors to make a proper audit of its asserted costs. In so holding the board rejected plaintiff's posi-

tion that defendant's auditors may not remove their work papers from plaintiff's premises without plaintiff's permission if they contain any proprietary information (other than cost data), and particularly the names of plaintiff's parts suppliers and the names and compensation of its employees; and that to insure compliance plaintiff has the right to review the work papers each day as the auditors leave the plant.

Contract DAAB07–70–C–0177 was awarded to plaintiff's Kleinschmidt Division [1] by the U.S. Army Electronics Command effective April 1, 1970. Phase I of the contract called for the delivery of engineering development/service test models of forward area tactical teletypewriter equipment. After several modifications and supplemental agreements the contract price for Phase I was as follows:

| | |
|---|---|
| Target Cost | $5,528,352 |
| Target Profit | 625,868 |
| Target Price | 6,154,219 |
| Ceiling Price | 6,676,145 |

To the extent that plaintiff's cost was below target, it was entitled to share the saving in a 60/40 ratio. To the extent its cost was above target, plaintiff was to share the additional burden in an 80/20 ratio.

On June 26, 1975, plaintiff submitted to the contracting officer a "Contract Pricing Proposal-Price Redetermination" form for the contract period April 1, 1970 to June 30, 1973, showing Phase I performance costs of $8,805,068, a sum more than $2,127,923 in excess of the ceiling price. However, on January 21, 1976, after bringing this suit, plaintiff submitted a revised form showing total contract costs for the same period to be $7,730,896, about a million dollars less than the previous claim. Mr. Harry S. Gaples, plaintiff's president, explained the discrepancy as attributable to the fact that the first claim was unaudited by plaintiff.

---

* The opinion and recommended conclusion of law are submitted in accordance with Rule 166(c). The necessary facts are stated in the opinion.

1. Plaintiff will hereinafter sometimes be referred to as Kleinschmidt.

Shortly after receipt of the first form, the contracting officer requested the Defense Contract Audit Agency (DCAA), Chicago, to perform an audit evaluation of the proposed price. However, when on August 4, 1975, the auditors met with Mr. Gaples, he laid down five rules he expected them to follow in conducting their audit, of which Rules 1 and 5 are:

Rule 1: No proprietary information other than cost data shall be taken out of this building, for example, vendor names.

Rule 5: Kleinschmidt doesn't want government personnel to take out of the Kleinschmidt plant originals or copies of originals of Kleinschmidt data.

The auditors left the plant, declining to make the audit, on the ground that an adequate audit could not be made under such conditions.

Plaintiff originally brought this suit on January 8, 1976. It alleged that on September 22, 1975, the contracting officer had informed plaintiff that since the contract auditors were not able to conduct the audit under plaintiff's restrictions on the removal of proprietary information from its plant, there was no dispute for him to rule upon and he could make no final decision on plaintiff's claim. However, on January 21, 1976, 2 weeks after the suit was filed, the contracting officer did issue a final decision denying payment for lack of a meaningful audit.

After considerable negotiation, on February 2, 1976, DCAA again sent two auditors to plaintiff's plant, and they commenced their audit. At the end of the following day, Gaples and another Kleinschmidt employee physically blocked the auditors' leaving until they turned over their work papers to him. Gaples then called the auditors' supervisor and told him that he had caught the auditors attempting to walk out with Kleinschmidt data. However, it was stipulated at the hearing that such work papers contained no data which plaintiff considers to be proprietary. The auditors did not return.

On February 17, 1976, plaintiff appealed the contracting officer's decision to the ASBCA.

On March 8, 1976, defendant moved to dismiss this suit without prejudice for plaintiff's failure to exhaust its administrative remedies, and on April 8, 1976, plaintiff cross-moved for summary judgment. By order filed December 6, 1976, the court ruled that the contracting officer's delay was not so unreasonable as to constitute a breach of contract and thereby to relieve plaintiff of its obligation to exhaust its administrative remedies. Accordingly, the court ordered the case remanded to the ASBCA for further proceedings under the contract.

The board found that because Mr. Gaples did not define "proprietary information" so that the auditors could themselves determine whether particular information was proprietary and because he indicated to them a lack of trust in their work (78–1 BCA, *supra*, at 64,168)—

the practical effect of rule 1 was to give appellant the power (1) to keep all information in its plant or (2) to review auditors' work papers to determine what information could be removed from appellant's plant and this applied to all information an auditor might seek to remove and was not limited to information labeled "proprietary" in advance of the audit.

This finding is supported by the record. Indeed, Mr. Gaples admitted it to be correct on cross-examination.

In its brief, plaintiff relies upon its right generally to protect its property. It claims that it has a proprietary interest in its list of parts vendors or suppliers, both because it developed such list privately through its own efforts, and because it has supplied tooling to many of them so that they may meet plaintiff's specifications (under agreements that they will not use the tooling to manufacture parts for anyone other than plaintiff). It says that if competitors and the Government can obtain this information, they will buy parts and spare parts (for machines purchased from plaintiff) directly from the suppliers and thereby de-

prive plaintiff of profit opportunities. It also claims that its lists of employees and their salaries is a valuable trade secret, since if any of its competitors ascertain such information they may try to hire them away, to plaintiff's loss. Plaintiff asserts that nothing in the contract authorizes the contract auditor to withdraw proprietary information from its premises.

Plaintiff suggests that a satisfactory audit report can be prepared if (1) in their work papers the auditors merely set forth a summary of their cost investigations without names; or, alternatively, (2) they use code names or numbers for the vendors and employees they have checked (translatable only with the aid of records in plaintiff's plant); or (3) they conduct all of their investigations by telephone from plaintiff's premises and allow plaintiff to retain all or such portion of their work papers as contains proprietary information in a locked file on plaintiff's premises.

Defendant in turn relies on contract clauses dealing with defendant's rights to audit and inspect. Insofar as pertinent, such contract provisions read as follows:

## AUDIT BY DEPARTMENT OF DEFENSE[2] (APRIL 1971)

(a) *General.* The Contracting Officer or his representatives shall have the audit and inspection rights described in the applicable paragraphs (b), (c), and (d) below.

(b) *Examination of Costs.* If this is a cost reimbursement type, incentive, time and materials, labor hour, or price redeterminable contract, or any combination thereof, the Contractor shall maintain, and the Contracting Officer or his representatives shall have the right to examine books, records, documents, and other evidence and accounting procedures and practices, sufficient to reflect properly all direct and indirect costs of whatever nature claimed to have been incurred and anticipated to be incurred for the performance of this contract. Such right of examination shall include inspection at all reasonable times of the Contractor's plants, or such parts thereof, as may be engaged in the performance of this contract.

(c) *Cost or Pricing Data.* If the Contractor submitted cost or pricing data in connection with the pricing of this contract or any change or modification thereto, * * * the Contracting Officer or his representatives who are employees of the U.S. Government shall have the right to examine all books, records, documents, and other data of the Contractor related to the negotiation, pricing or performance of such contract, change or modification, for the purpose of evaluating the accuracy, completeness and currency of the cost or pricing data submitted. * * * The right of examination shall extend to all documents necessary to permit adequate evaluation of the cost or pricing data submitted, along with the computations and projections used therein.

\*    \*    \*    \*    \*    \*

(e) *Availability.* The materials described in (b), (c), and (d) above shall be made available at the office of the Contractor, at all reasonable times, for inspection, audit, or reproduction, until the expiration of three years from the date of final payment under this contract or such lesser time specified in Appendix M of the Armed Services Procurement Regulation, and for such longer period, if any, as is required by applicable statute, or by other clauses of this contract, or by (1) and (2) below:

\*    \*    \*    \*    \*    \*

(2) Records which relate to appeals under the "Disputes" clause of this contract, or litigation or the settlement of claims arising out of the performance of this contract, shall be made available until such appeals, litigation, or claims have been disposed of.

On the apparent assumption by both parties that the term "audit" is used in the

---

**2.** 32 CFR § 7.104–41 (1972). This clause is an April 1971 revision of the clause in effect when the contract was initially executed. However, it was substituted by a December 6, 1971 contract modification.

contract as it is generally understood by accountants and auditors, the trial was in large measure devoted to expert testimony on the question of whether or not under generally accepted accounting standards "audit" encompasses a right in the auditor to record in his work papers names of the auditee's suppliers and its employees and their compensation, free of review by the auditee and free of restrictions against removal of such information from the auditee's premises. The board found that it does. It stated (78–1 BCA, *supra,* at 64,-167):

[T]here is no such thing as an absolute right in the auditee to prohibit information from being recorded or from leaving its plant or office. The standards make clear that the auditor has the final say as to what he will record and the auditee has only the right to seek to persuade him to omit certain data. Where the auditor is persuaded to omit information from his work papers it must be assumed that he has exercised a judgment that the omitted information is not evidentiary matter necessary for the proper conduct of the audit or of any subsequent report.

The board found that an important aspect of auditing practice is that of "confirmations," *i. e.,* the practice of obtaining evidentiary matter from independent sources outside an auditee's establishment either in writing or orally, to corroborate or to dispute the auditee's records. With respect to this it concluded (78–1 BCA, *supra,* at 64,168):

We find that confirmations are an integral part of a normal audit and require that the auditor record and remove from the auditee's premises sufficient information so that proper confirmations may be made, including where necessary, information which may be considered proprietary by the auditee.

The board's findings in regard to the foregoing are supported by the testimony of four qualified expert accountant witnesses: Donald L. Sweeney, a CPA licensed in three states, who is Director of Professional Ethics for the American Institute of Certified Public Accountants, and has also had many years of experience in the practice and teaching of accounting at the university level; Charles J. Solomon, a government contract auditor for DCAA, the Army and other government agencies for approximately 25 years; Delbert L. Brewer, Chicago branch manager of DCAA since 1966 and supervisor of 40 to 50 professional auditors; and Christian S. Schoeberlein, Chief of the Audit Guidance and Procedures Division at DCAA headquarters, who is also a CPA with many years of accounting experience with large accounting firms and with a number of government organizations.

In substance these witnesses testified that in auditing a contractor's costs on a large government contract—

1. The auditor should accumulate and supply sufficient evidence in his work papers to back up his opinion and report. The extent of such evidence is a matter to be resolved by the exercise of independent judgment by the auditor.

2. An important part of that evidence is that necessary to confirm that the amounts listed on the contractors' records as having been paid to suppliers were in fact paid, and that the merchandise was in fact received. This is done both by comparing accounting records with invoices and by some independent checking with suppliers. Major frauds have occurred where there has been an absence of independent confirmation.

3. Under a cost reimbursement contract it may also be necessary for the auditor to confirm the reasonableness of the suppliers' prices by comparing them with prices on prior purchase or by other means.

4. To accomplish this it is essential for the auditor to record the names of such suppliers (or a representative sampling of them) and their addresses.

5. It is not sufficient for the auditor merely to call the suppliers for verification from the contractor's premises, because independent confirmation requires that the vendors' response be sent to the auditor at a separate address.

6. As a part of the audit, the auditor may also find it necessary to record the names, qualifications, duties and salaries of particular employees, so that the work papers will reflect the basis for their allowance as reasonable or disallowance as unreasonable, their proper allocation between government contract work and other services, and the extent and nature of the auditor's investigation of such facts.

7. The information so developed should be recorded in the work papers which accompany the audit report to enable review by supervisors, to refresh the auditor's memory for future reference, and for use in the event of administrative controversy or litigation. DCAA audit reports, including the work papers, are generally reviewed by supervisors and by the branch chief.

8. The auditee should not have the right to review what the auditor puts in his work papers because it would impair the auditor's independence, it would expose the auditor's test pattern or plan of sampling and investigation, it would enable the auditee to circumvent the audit process, and it would be likely to jeopardize the contracting officer's negotiating position in a price redetermination.

9. Recording of lists of vendors and employees has always been a matter of course in DCAA audits. Eighty-to-90 percent of the 15,000 to 20,000 audits by the Chicago branch of DCAA during Brewer's tenure have contained documentation using vendors' and employees' names.

10. In the thousands of audits conducted or supervised by the witnesses, none had ever encountered a situation wherein the contractor had sought to exclude such data from work papers.

11. An audit under the conditions imposed by plaintiff, which would bar the auditor from documenting his report with pertinent evidentiary materials because in the auditee's opinion it is confidential or proprietary, would not be conducted in a manner consistent with generally accepted auditing standards, because the contractor auditee and not an independent auditor would be dictating the terms of the audit.

Leading auditing texts corroborate the testimony of the expert witnesses and support the board's findings:

The American Institute of Certified Public Accountants (AICPA), a voluntary nationwide organization for the establishment of auditing standards, publishes the *Codification of Statements on Auditing Standards* (1977). This states:

AU Section 330

Evidential Matter

.01 The third standard of field work is:

> Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under examination.

.02 Most of the independent auditor's work in formulating his opinion on financial statements consists of obtaining and examining evidential matter. The measure of the validity of such evidence for audit purposes lies in the judgment of the auditor * * *.

Nature of Evidential Matter

.03 Evidential matter supporting the financial statements consists of the underlying accounting data and all corroborating information available to the auditor.

\* \* \* \* \* \*

.05 Corroborating evidential matter includes documentary material such as checks, invoices, contracts, and minutes of meetings; confirmations and other written representations by knowledgeable people; information obtained by the auditor from inquiry, observation, inspection, and physical examination; and other information developed by, or available to, the auditor which permits him to reach conclusions through valid reasoning.

\* \* \* \* \* \*

Competence of Evidential Matter

.08 * * *

a. When evidential matter can be obtained from independent sources

outside an enterprise, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the enterprise.

\* \* \* \* \* \*

Sufficiency of Evidential Matter

.09 The amount and kinds of evidential matter required to support an informed opinion are matters for the auditor to determine in the exercise of his professional judgment after a careful study of the circumstances in the particular case. \* \* \*

AU Section 338

Working Papers

\* \* \* \* \* \*

Functions and Nature of Working Papers

.02 Working papers serve mainly to:

a. Aid the auditor in the conduct of his work.

b. Provide an important support for the auditor's opinion, including his representation as to compliance with the generally accepted auditing standards.

.03 Working papers are the records kept by the independent auditor of the procedures he followed, the tests he performed, the information he obtained, and the conclusions he reached pertinent to his examination. Working papers, accordingly, may include work programs, analyses, memoranda, letters of confirmation and representation, abstracts of company documents, and schedules or commentaries prepared or obtained by the auditor.

.04 Working papers should fit the circumstances and the auditor's needs on the engagement to which they apply. The factors affecting the independent auditor's judgment as to the quantity, type, and content of the working papers desirable for a particular engagement include (a) the nature of the auditor's report, (b) the nature of the financial statements, schedules, or other information upon which the auditor is reporting, (c) the nature and condition of the client's rec-

ords and internal controls, and (d) the needs in the particular circumstances for supervision and review of the work performed by any assistants.

The AICPA standards make clear that the determination of the evidential matters to be retained in the audit work papers, including independent verifications and confirmations, is the responsibility of the auditor, and that where the audit report is to be reviewed the work papers should aid in such review by showing the evidentiary basis for the report.

The *Accountants' Handbook* (Edited by Rufus Wixon) (4th ed. 1965), under the heading "Review of Purchase Invoices," reproduces examples of typical work papers supporting an audit. Such work papers set forth lists of vendors whose invoices are to be further investigated. A note to the schedule states that "Audit working papers for purchases should be designed to facilitate the verification procedure and to reveal the work done by the auditor."

W. Meigs, E. Larsen and R. Meigs, Principles of Auditing (5th ed. 1973) states:

Audit working papers are complete when they clearly reflect full information regarding the composition of all significant data in the records, together with the methods of verification employed and such other evidence as is necessary for the preparation of an opinion and report.

Plaintiff's expert witness, Allen Peterson, a CPA for approximately 20 years and a partner in a large and well-known accounting firm, testified that in normal auditing there is no general practice requiring vendors' names to be included in auditors' working papers; that when a client requests that such data be kept confidential it should not be disclosed or recorded; and that generally an auditor follows his client's wishes as to what is to be excluded from the work papers, or at most it is a matter for the client and auditor to negotiate. However, it is clear from Mr. Peterson's testimony that he focused primarily on the kind of auditing which is done of and for a client. He conceded that there is a differ-

ent situation and audit objective when a government auditor conducts an audit of a contractor's costs. He characterized that relationship as "adversary or potentially adversary." He also conceded that in the latter type of situation it may sometimes be necessary to record vendors' names, particularly if there is a possibility of fraud.

■ Thus to the extent the meaning and scope of the term "audit" may not be determined solely from the contract, the board's findings must be affirmed because they are supported by substantial evidence of generally accepted accounting standards. (41 U.S.C. § 321.)[3]

The meaning which may be inferred from evidence within the four corners of the contract itself is consistent with the extrinsic evidence. It has been cogently observed that the term "audit"—

is to be ascertained from the context, surrounding facts and the purpose to be accomplished, that sometimes it is restricted in meaning to a checkup of the correctness of the account or claim and excludes any element of discretion on the part of the auditor; that at other times, it may embrace not only an examination of accounts and a comparison of charges with vouchers, but also an allowance or rejection of charges and a statement of balance for the purpose of determining the amount, if any, to be paid thereon * * *.

7 C.J.S. Audit, at 1274, quoted with approval in *Application of Sullivan*, 297 N.Y. 190, 194, 78 N.E.2d 467, 469 (1948); and *Atlantic City Transportation Co. v. Director, Division of Taxation*, 12 N.J. 130, 142, 95 A.2d 895, 900 (1953).

■ It is evident that in the context of the cost reimbursement contract at issue, "audit" is used in the latter rather than the former sense. This is particularly emphasized by the fact that the contract defines

"cost" as meaning "allowable cost in accordance with Section XV of the Armed Services Procurement Regulations," entitled Contract Cost Principles and Procedures (32 CFR, Pt. 15 (1971)). ASPR § 15.201–2 provides that "Factors to be considered in determining the allowability of individual items of cost include * * * reasonableness." ASPR § 15.201–3(a) defines "reasonableness" by stating that—

[a] cost is reasonable if, in its nature or amount, it does not exceed that which would be incurred by an ordinarily prudent person in the conduct of competitive business. The question of the reasonableness of specific costs must be scrutinized with particular care in connection with firms or separate divisions thereof which may not be subject to effective competitive restraints. What is reasonable depends upon a variety of considerations and circumstances involving both the nature and amount of the cost in question. * * *

Such regulation also prescribes that in determining the reasonableness of a given cost consideration shall be given to, among others, "[t]he restraints or requirements imposed by such factors as generally accepted sound business practices [and] arm's length bargaining," prudent business practices considering the contractor's responsibilities to the Government, and significant deviations from the established practices of the contractor which may unjustifiably increase the contract costs. ASPR § 15.205–22 prescribes that the cost of materials must be suitably adjusted for available trade and cash discounts, rebates, allowances, and credits for scrap, salvage and returns. Where compensation for personal services is claimed as a cost, § 15.205–6 provides that it is allowable only to the extent that the compensation is reasonable for the services rendered by the individual employee and it

---

**3.** While it has been frequently held that the meaning of a contract is a question of law, if there is a need to resort to extrinsic evidence of which the court may not take judicial notice, the ultimate determination may be based on resolution of a question of fact. *Tri-Cor, Inc. v. United States*, 198 Ct.Cl. 187, 204, 458 F.2d 112, 122 (1972); *Construction Management Corp. v. Brown & Root, Inc.*, 41 Misc.2d 864, 246 N.Y. S.2d 465, 471 (S.Ct.1964), *aff'd on this point*, 25 App.Div.2d 843, 270 N.Y.S.2d 95 (1966); and 4 S. Williston on Contracts § 616 at 660 (3d ed. 1961); 3 A. Corbin on Contracts §§ 554, 555 (1960).

is not in excess of the costs allowable under the Internal Revenue Code.

■ Under these circumstances, it is patent that a proper audit requires that the government auditor, advising the contracting officer as to the allowability of reimbursable costs, have available to him the names, addresses and invoices, as well as the accounts of vendors and suppliers, so that he can be free to investigate the particular circumstances under which such costs were incurred—*i. e.*, whether the purchases were at arm's length and at competitive prices, how the prices compare with prior purchases, and whether proper discounts were taken. Similarly, the auditor must have available to him the names and qualifications of, and services rendered and compensation received by, particular employees claimed to have performed services pursuant to the contract, so that he may render an opinion as to whether such costs are reasonable for the services rendered, and whether the services are necessary, and properly allocable to the particular contract.

It is only common sense that the auditor should record, if not in his report at least in his work papers, the extent and nature of his investigations and the additional matters which can be further investigated if need be, so that his recommendations and conclusions can be weighed by his superiors and by the contracting officers. And such notations are also needed for future reference if an auditor or his successor is ever asked about them or required to supplement the audit, or in the event of a controversy or litigation. Control over access to such work papers could not reasonably be left to the contractor-auditee.

Plaintiff placed in evidence rules of the Professional Standards of the American Institute of Certified Public Accountants prohibiting disclosure of a client's confidential information. However, the ASBCA correctly found that, "In none of the standards or the accompanying explanatory texts did we find any prohibition on the right of an auditor to include pertinent data in working papers or schedules." (78–1 BCA, *supra*, at 64,167.)

Plaintiff concedes that the obtaining of information by the auditor as to suppliers and employees is a legitimate part of the audit; but it argues that nothing in the contract authorizes the auditor to withdraw such information from plaintiff's premises. The short answer to plaintiff's contention is that by necessary implication the contract does so provide. As we have seen, the recording of evidentiary matters supporting the audit report in work papers accompanying the report or retained by the auditor is implicit in a contract audit. In addition, paragraph (e) of the audit clause, set out at page 896, *supra*, provides that the contractor's pertinent books, records, documents and other evidence shall be made available at the contractor's office "for inspection, audit, or *reproduction*," for a period of at least 3 years after final payment or the conclusion of litigation arising out of the contract. (Emphasis supplied.) Plaintiff's argument that this does not cover removal of information either mechanically reproduced or copied is difficult to understand. The right to reproduce would be meaningless if the auditor could not take with him any data he copied in his work papers and could only examine it on plaintiff's premises.

Plaintiff claims that withdrawal of such information in the auditor's work papers is tantamount to public disclosure. The board found, however, that there was "no evidence of public disclosure" of plaintiff's sources of supply or other proprietary or confidential information. And when, prior to the hearing, defendant submitted to plaintiff an interrogatory inquiring as to whether any of plaintiff's proprietary data obtained by the Government during audits of its defense contracts had ever been released to the public, plaintiff responded that it "had never alleged that DCAA disclosed such information to the public." There was also no evidence of a threat of such disclosure. The board noted that government employees are forbidden both by the DCAA regulation and by law from making public disclosure of information recorded in audit reports and work papers

which the contractor regards as confidential.[4] And the board further found (78–1 BCA, *supra*, at 64,166):

> The Government's principal witness, as Director of Professional Ethics for AICPA, was in a position to know if any significant deviations from normal accounting or auditing standards were practiced by DCAA over a period of time. He testified that to the extent that he was aware of the reputation of the DCAA it was known to be an honorable competent and highly professional organization * * *.

Plaintiff's complaint that disclosure of its proprietary information will be made to the contracting officer is a statement of no more than what plaintiff has agreed to in the contract. The audit clause gives audit and inspection rights to "[t]he Contracting Officer or his representatives." If plaintiff desires to keep the contracting officer in the dark as to the identities of its suppliers, so that he will not thereafter contract directly with them for spare parts at lower prices, it should not have contracted with the Government on a cost-reimbursement basis necessitating audit of plaintiff's supply costs.

Plaintiff argues that if, under the restrictive rules it seeks to impose, the proprietary data in the auditor's work papers is retained under lock and key on plaintiff's premises, then the burden on the auditor, his assistants, his reviewers and the contracting officer of having to come to plaintiff's plant to examine or review the data will be relatively minor as compared to the adverse financial consequences which plaintiff will otherwise have to bear if its sources of supply for spare parts are listed on records in the Government's possession. But this is irrelevant if under the contract as a part of a proper audit the Government is entitled to obtain and keep in its own possession and under its own control the evidentiary basis on which its officers approve payment of the contractor's claimed costs.

The record discloses that plaintiff was no stranger to government contracts and audits even before entering into the instant contract on April 1, 1970. DCAA Chicago branch records reveal that between 1966 (when DCAA was formed as a separate organization) and 1975 it conducted approximately 125 audits of Kleinschmidt's government contracts, of which more than 40 preceded April 1970. In addition, Charles J. Solomon, a DCAA auditor, testified that he had conducted approximately 15 defense contract audits at the Kleinschmidt plant from 1955 to early 1970 and in these he had always documented his work papers with the names of vendors. In no instance prior to 1975 did plaintiff communicate to the Government its present position that the right to audit does not encompass the right to include in the work papers the auditor takes away with him the names of plaintiff's vendors and of employees and their compensation. If plaintiff decided to limit the audit process in the manner it now seeks, it should have done so when it entered into the contract and given the Government the opportunity to decide whether or not it wished to (or even may) enter into a cost-reimbursement contract on a restricted audit basis.

4. The DCAA Audit Manual provides:

"1–206 Relationship—DCAA and Contractors.
    1–206.1 *Safeguarding Information.* Working papers, audit reports, unpublished financial statements, correspondence, files, and other records and sources available to or in the possession of the auditor usually contain information which the contractor regards as confidential. Such information will be used by the auditor only for performance of his official duties. It shall not be disclosed to unauthorized persons except with the permission of the contractor, and shall not be discussed in a manner which might permit disclosure to unauthorized persons. Audits should be performed in such privacy as may be warranted under the circumstances and all necessary safeguards of contractor-confidential data will be provided.
The law pertaining to unauthorized disclosure of contractor information, and penalties for violation thereof, is reproduced in Appendix D."
    Title 18 U.S.C. § 1905 provides generally that any government employee who discloses in any manner or to any extent not authorized by law a contractor's trade secrets or confidential data obtained in the course of his official duties shall be fined or imprisoned and removed from his employment.

Mr. Gaples claims that until 1975, when he obtained copies of documents under the Freedom of Information Act, he was unaware of what data the auditors were taking out of the plant. But plaintiff does not explain why such information was not available to it at any time. If it asked its own personnel what records and invoices the auditors asked to examine, it would have had more than an inkling as to what the auditors put in their work papers. In any event, the Government is not responsible for plaintiff's lack of knowledge of the scope and documents involved in a proper contract audit under generally accepted auditing standards. In entering into the contract, defendant had the right to assume that both parties understood that an audit involved the same procedures in which government auditors generally engage and which no one had previously contested. While plaintiff has the right to insist on its restrictions on audit procedures for any future contracts, it has no right to impose them unilaterally and retroactively on an existing contract.

Finally, plaintiff argues that it is entitled to take measures which will prevent the abuse of audit rights whereby the auditor or contracting officer discloses proprietary and confidential information obtained in the course of audit to other contracting officers and other government departments.

Defendant admits that data properly obtained in the course of audits, including the names of contractors' suppliers, is exchanged between government purchasing offices on a need-to-know basis.[5] This is

also apparent from provisions of the Defense Contract Audit Manual which state:

12–804 Exchange of Information Between the Auditor and the Contracting Officer's Representative.

(a) Maximum Cooperation in Exchange of Information. The Government's interest can best be served by maximum cooperation and exchange of useful information between audit and procurement personnel. * * *

\*     \*     \*     \*     \*     \*

12–804.1 *Exchange of Purchase Information Between Procuring Activities.*

(a) ASPR 1–303 provides for the exchange of purchase information between procuring activities where the same item or class of items is being purchased by more than one military department or by more than one procuring activity within a military department. This requirement is for the purpose of exchanging and coordinating pertinent information, particularly cost and pricing data, between the military departments or procuring activities. A major objective of such coordinating activity is to promote uniformity in the treatment of major issues and the resolution of particularly difficult or controversial issues.

and—

4–206.2 * * *

\*     \*     \*     \*     \*     \*

(i) Breakout of Material Purchases. The auditor should ascertain whether material or component parts purchased by

---

5. The following responses to pre-hearing interrogatories were made by defendant:

"*INTERROGATORY NO. 5*

"State the references to any known published standards, manuals, or regulation which permit the use or disclosure of confidential contractor proprietary data for any purpose other than the specific audit purpose.

"RESPONSE: 5. ASPR 1–303; DCAM 12–804.1.

"*INTERROGATORY NO. 6*

"(a) State the number of occurrences of disclosure of confidential contractor proprietary data at any time for any purpose other than

specifically to accomplish the specific audit assignment.

"(b) Identify the recipient of the data disclosed for each occurrence and the reasons, authority, and purpose for which the data was disclosed. Also, describe the use made of the data disclosed by the recipient of such data.

"RESPONSE:

"6. a. and b. Although no specific data is available, cost data obtained from a contractor is exchanged on a need to know basis solely within the Government between purchasing offices as a matter of course. This includes names of vendors where appropriate."

the contractor for incorporation in the contract end item include common items of high cost major components or subassemblies. When common items are included, the auditor should analyze the material cost to determine if a "breakout" (direct purchase) of common items would reduce costs charged to Government contracts. In addition to breakout of common items, the contractor may purchase other items which would be more economical for the Government to purchase directly. Spare parts procurement is an area which deserves special attention because, in some instances, the prime contractor may perform only the procurement function, and it may be more economical and practical for the Government to procure parts directly from the supplier. * * *

Whether or not the exchange of such information is or would be an abuse of the audit clause depends upon whether or not it is permitted by the contract. The record does not disclose when plaintiff first obtained a copy of the Defense Contract Audit Manual and whether or not it was prior to the time it entered into the instant contract.[6] However, there may be imputed to plaintiff knowledge of parallel provisions of the Armed Services Procurement Regulations, which provide as follows:

1–303 Exchange of Purchase Information.[7]

(a) When the same item or class of items is being purchased by more than one Department, or by more than one procuring activity within a Department, the exchange and coordination of pertinent information, particularly cost and pricing data, between these Departments or procuring activities is necessary to promote uniformity of treatment of major issues and the resolution of particularly difficult or controversial issues. Such exchange and coordination of information is particularly beneficial during the period of procurement planning, presolicitation, evaluation, and pre-award survey.

(b) When substantial purchases of major items are involved or where the purchasing activity deems it desirable, it shall request appropriate information (on both the end item and on major subcontracted components) from other purchasing activities responsible for buying similar items. Each activity receiving such requests shall furnish the information requested. * * *

■ Such regulations are deemed terms of the contract even if not specifically set out therein. *DeMatteo Construction Co. v. United States*, 220 Ct.Cl. ——, 600 F.2d 1384 (1979); *G.L. Christian & Associates v. United States*, 160 Ct.Cl. 1, 12, 15, 312 F.2d 418, 424, 426, *rehearing denied*, 160 Ct.Cl. 58, 320 F.2d 345, *cert. denied*, 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963); *Chris Berg, Inc. v. United States*, 192 Ct.Cl. 176, 182, 426 F.2d 314, 317 (1970); *General Builders Supply Co. v. United States*, 187 Ct.Cl. 477, 484, 409 F.2d 246, 250–51 (1969).

However, it is unnecessary to decide in this case whether the subsequent exchange between government procurement offices of proprietary data properly obtained in the course of a contract audit is a misuse, since there is no evidence whatsoever that it has actually occurred in the administration of

---

**6.** Even if a document is not published in the *Federal Register*, a person having actual knowledge of its contents may be bound by it. *Timber Access Industries Co. v. United States*, 213 Ct.Cl. 648, 656, 553 F.2d 1250, 1255 (1977); *Miller v. United States*, 209 Ct.Cl. 135, 144, 531 F.2d 510, 515 (1976); *Kessler v. F.C.C.*, 326 F.2d 673, 689–90 (D.C. Cir. 1963); *United States v. Floyd*, 477 F.2d 217, 222 (10th Cir.), *cert. denied*, 414 U.S. 1044, 94 S.Ct. 550, 38 L.Ed.2d 336 (1973).

**7.** 32 CFR § 1.303 (1971).

the instant contract.[8] The question at issue here is simply whether under the contract the possibility that an abuse *may* occur can be a justification for awarding payment of asserted costs on the basis of only a limited audit report unsupported by adequate evidence of the extent of the auditor's investigations. The answer must be that nothing in the contract entitles the contractor to such payment without an unrestricted audit.[9]

## CONCLUSION

■ Plaintiff is not entitled to payment under the contract at issue until it allows the contracting officer to make a proper audit of its claim. Accordingly, defendant's motion for summary judgment is allowed and plaintiff's cross-motion is denied. The petition is dismissed.

---

**8.** The question was put to Gaples:

"Do you know for a fact whether DCAA has at any time given 'proprietary' information, exchanged such information to other purchasing officers or other procuring activities, you know, Kleinschmidt proprietary information?"

And he responded: "I don't recall any."

**9.** If there were an actual misuse of plaintiff's proprietary data obtained for limited purposes pursuant to a government contract, it would appear that a claim for a constructive change or a suit for breach of contract would lie. *International Engineering Co., Div. of A–T–O, Inc. v. Richardson,* 512 F.2d 573, 578–79 (D.C. Cir. 1975), *cert. denied,* 423 U.S. 1048, 96 S.Ct. 774, 46 L.Ed.2d 636 (1976); *Canadian Commercial Corp. v. United States,* 202 Ct.Cl. 65 (1973); *Compudyne Corp. v. United States,* 72-1 BCA ¶ 9218 (ASBCA 1971).