**S.J. AMOROSO CONSTRUCTION CO., INC., Plaintiff-Appellant,**

v.

**The UNITED STATES, Defendant-Appellee.**

**No. 92-5167.**

United States Court of Appeals, Federal Circuit.

Dec. 17, 1993.

Peter V. Shackter, McCarthy, Flowers & Roberts, of San Francisco, CA, argued for plaintiff-appellant.

John P. Sholar, Atty., Commercial Litigation Branch, Dept. of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Martha H. DeGraff, Asst. Director.

Before ARCHER, MICHEL, and PLAGER, Circuit Judges.

ARCHER, Circuit Judge.

S.J. Amoroso Construction Co., Inc. (Amoroso) appeals the summary judgment of the United States Claims Court,[1] *S.J. Amoroso Construction Co. v. United States*, 26 Cl.Ct. 759 (1992), denying Amoroso's claim for additional compensation under a contract with the Army Corps of Engineers (Corps). We affirm.

## I.

The facts underlying this appeal are set forth more completely in the opinion of the Claims Court, 26 Cl.Ct. 759, and a familiarity with that opinion is presumed. On August 17, 1987, the Corps and Amoroso entered into a $10,786,274.20 contract for the construction of a commissary building at the Presidio, San Francisco, California. The contract was subject to the requirements of the Buy American Act (BAA), 41 U.S.C. §§ 10a–10d (1982), and corresponding Federal Acquisition Regulations (FAR), *see* 48 C.F.R. §§ 52.225–1 to –14 (1986). Instead of using the FAR clause for construction contracts, 48 C.F.R. § 52.225–5 (hereafter clause 34), however, the contract included the FAR clause pertaining to nonappropriated fund supply contracts, 48 C.F.R. § 52.225–3 (hereafter clause 79). Amoroso does not dispute that the contract in this case is a construction contract.

Amoroso subcontracted with Bostrom–Bergen Metal Products (Bostrom) on September 25, 1987, for structural steel, miscellaneous steel, structural welding, ultrasonic inspection of welds and steel joists. After Bostrom informed Amoroso that it intended to purchase material from a foreign mill, Amoroso notified Bostrom by letter dated December 28, 1987 that its "products are not preassembled, therefore each item that is

---

1. The Claims Court was renamed the Court of Federal Claims on October 29, 1992. Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516.

delivered to the site must be American made." Amoroso enclosed with the letter a Corps compliance memorandum entitled "Updated Guidance on Buy American Act," dated December 9, 1982, which, *inter alia*, provided:

4.  ... construction materials means articles, materials and supplies brought to the site for incorporation in the building or work. Components means articles, materials and supplies directly incorporated in construction materials.

5.  Where the construction material has only one part it becomes synonymous with component. A Japanese beam is made of one component, hence the beam is 100% Japanese. Since the beam must be 50+% 'domestic' (or excluded) components, it is rejected.

In January 1988, Amoroso requested that Bostrom confirm in writing its compliance with the BAA. Bostrom responded in a January 21, 1988 letter in which it set out the total cost for foreign steel purchased as $70,882.60 and the total cost of "domestic product" as $101,767.64. The actual cost figures for "domestic product" apparently were adjusted downward because Amoroso thereafter informed the Corps that foreign steel costs were $70,000.00 and that domestic costs were $88,820, comprising the following:

DOMESTIC—LABOR & MATERIAL

| | |
|---|---|
| Cost to detail & cut raw material into specified lengths (beams) | $ 8,000 |
| Cost to install domestic material (connectors, angles, etc.) to the beams. Labor & material | $52,470 |
| Cost to apply domestic material (protective coating) to the beams. Labor & Material | $28,350 |
| | $88,820 |

The cost figures furnished to the Corps represented the aggregate costs associated with all steel beams to be delivered to the site by Bostrom.

In a letter dated February 10, 1988, the Corps advised Amoroso that each beam must be considered "separately and singularly" in determining compliance with the BAA requirements and that costs of "[o]perations done on the foreign steel, such as drilling and cutting, do not result in its being combined with domestic materials and are not considered to alter the imported component percentage." Bostrom thereafter performed individual computations for the approximately 1,000 steel pieces required under the contract. Only about two-thirds of them were found to comply with the Corps's interpretation of the BAA requirement.

On December 27, 1988, Amoroso submitted a certified claim on behalf of Bostrom to the Contracting Officer (CO), asserting that it was proper to consider the entire group of steel pieces for determining compliance with the BAA, and that the Corps incorrectly required each piece of steel delivered to the construction site to comply with the BAA. Amoroso sought $363,250.00 for the costs incurred in testing the steel pieces and replacing the ones that under the Corps's interpretation did not satisfy the BAA requirements. The CO denied Amoroso's claim in a final decision issued November 21, 1990. The Claims Court affirmed the CO's final decision by granting the government's motion for summary judgment and denying the cross-motion of Amoroso. This appeal followed.

## II.

A. Amoroso argues that the Claims Court erred in construing the contract to include by operation of law clause 34 (the BAA clause required by FAR § 52.225-5 to be used in construction contracts) in lieu of clause 79. It contends that there is no strong federal procurement policy that requires clause 34 to be used. Amoroso also argues that even if clause 34, rather than clause 79, is held applicable, it should nonetheless be entitled to aggregate the costs of the steel beams delivered to the construction site in determining compliance with the BAA. Finally, Amoroso contends that the Claims Court erred in holding that cost of labor and transportation to the site cannot be included in the domestic

costs of the steel beams in measuring compliance with the BAA.[2]

■ B. The Claims Court construed the contract to include clause 34 for construction contracts under the authority of *G.L. Christian & Associates v. United States*, 312 F.2d 418, *aff'd on reh'g*, 320 F.2d 345, 160 Ct.Cl. 58 (1963). Under the so-called *Christian* doctrine, a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law. *General Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed.Cir.1993); *G.L. Christian*, 312 F.2d at 424, 427; *see also SCM Corp. v. United States*, 645 F.2d 893, 903–04, 227 Ct.Cl. 12 (1981); *Chris Berg, Inc. v. United States*, 426 F.2d 314, 317, 192 Ct.Cl. 176 (1970).

■ As an initial matter, Amoroso contends that the *Christian* case is inapplicable because in that case a clause was inadvertently omitted whereas in this case clause 79 was intentionally substituted for clause 34.[3] This distinction, as the Claims Court held, is irrelevant. Application of the *Christian* doctrine turns not on whether the clause was intentionally or inadvertently omitted, but on whether procurement policies are being "avoided or evaded (deliberately or negligently) by lesser officials." *G.L. Christian & Assoc.*, 320 F.2d at 351. The *Christian* doctrine "guard[s] the dominant legislative policy against *ad hoc* encroachment or dispensation by the executive" and prevents "hobbl[ing] the very policies which the appointed rule-makers consider significant enough to call for ... mandatory regulation." *Id.; see also General Eng'g*, 991 F.2d at 779.

Moreover, the *Christian* doctrine echoes Supreme Court law that the United States is neither bound nor estopped by its agents who act beyond their authority or contrary to statute and regulations. *See Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *see also Yosemite Park & Curry Co. v. United States*, 582 F.2d 552, 558, 217 Ct.Cl. 360 (1978); *Porter v. United States*, 496 F.2d 583, 590, 204 Ct.Cl. 355 (1974).

■ Amoroso's principal argument is that there is no significant or deeply ingrained strand of public procurement policy requiring the inclusion of the correct BAA clause—clause 34 rather than clause 79—in this contract. We disagree.[4] The BAA, first enacted in 1933, has long required in express terms that every construction contract for public buildings and works "shall contain a provision that in the performance of the work" only American materials will be used. 41 U.S.C. § 10b. Section 10b reads in pertinent part:

(a) Every contract for the construction, alteration, or repair of any public building or public work in the United States growing out of an appropriation heretofore made or hereafter to be made shall contain a provision that in the performance of the work the contractor, subcontractors, material men, or suppliers, shall use only such unmanufactured articles, materials, and supplies as have been mined or produced in the United States, and only such manufactured articles, materials, and supplies as have been manufactured in the United States substantially all from articles, materials, or supplies mined, produced, or manufactured, as the case may be, in the Unit-

2. Although Amoroso argues that the cost of transportation should be included for measuring compliance with the BAA, it has not indicated, nor have we found in the record, the amount and nature of these transportation costs or whether they were presented to the CO.

3. Although the Claims Court noted that evidence relating to the circumstances which led to the inclusion of clause 79 was not presented, the court indicated that all justifiable inferences should be drawn in non-movant Amoroso's favor in deciding the government's summary judgment motion. We also assume that the substitution of clause 79 for clause 34 was intentional.

4. Because we hold that use of clause 34 in construction contracts is required by a clear and deeply ingrained public procurement policy, we consider Amoroso's reliance on *Chamberlain Manufacturing Corp.*, ASBCA No. 18103, 74–1 BCA (CCH) ¶ 10,368 (1973), to be unpersuasive. There the Armed Services Board of Contract Appeals held that the omission of the Government Property Clause in a contract, even though required by regulations, did *not* implicate strong procurement policy.

ed States except as provided in section 10a of this title: *Provided, however,* That if the head of the department or independent establishment making the contract shall find that in respect to some particular articles, materials, or supplies it is impracticable to make such requirement or that it would unreasonably increase the cost, an exception shall be noted in the specifications as to that particular article, material, or supply, and a public record made of the findings which justified the exception.

41 U.S.C. § 10b. Moreover, since its enactment the BAA has distinguished between contracts for public works (construction contracts) and materials required for public use (supply contracts). *Compare* 41 U.S.C. § 10b (entitled "Contracts for public works; specification for use of American Materials; blacklisting contractors violating requirements") *with* 41 U.S.C. § 10a (entitled "American materials required for public use"). The statute alone, therefore, evidences a significant and deeply ingrained strand of public procurement policy sufficient to require incorporation of the clause prescribed for construction contracts (clause 34) as a matter of law.

In addition, the procurement regulations themselves have reflected this significant, statutory policy for over 25 years. The FAR, promulgated in 1983, requires that "[t]he Contracting Officer shall insert the clause at 52.225–5, [clause 34], Buy American Act—Construction Materials, in solicitations and contracts for construction inside the

**5.** The relevant ASPR section, 18.509–5, provided that "[t]he clause set forth below shall be inserted in all contracts for construction, except those executed on Standard Form 19 and DD Form 1155."

**6.** The relevant FPR section, 1–18.605, provided that "[e]xcept for contracts executed on Standard Form 19, contracts for affected construction shall include the following clause."

**7.** Clause 79 of the contract reads in pertinent part:
    79. BUY AMERICAN ACT
    (a) In acquiring end products, the Buy American Act (41 U.S.Code 10a–d) is implemented by Executive Order 10582, 17 Dec 1954, provides that the fund give preference to domestic source end products. For the purpose of this clause:

United States." 48 C.F.R. § 25.205 (1983). The procurement regulations that preceded the FAR—the Armed Services Procurement Regulations (ASPR) and the Federal Procurement Regulations (FPR)—similarly required in express terms that every construction contract include a Buy American Act clause, which in each case was in substance the same as the FAR required clause 34. *See* 32 C.F.R. § 18.509–5 (1969) (ASPR);[5] 41 C.F.R. § 1–18.605 (1969) (FPR).[6]

■ Moreover, even though the contract contains clause 79 for supply contracts, Amoroso should have realized that this clause was included in error and had a duty to inquire. *See Newsom v. United States,* 676 F.2d 647, 649, 230 Ct.Cl. 301 (1982); *WPC Enter., Inc. v. United States,* 323 F.2d 874, 877, 163 Ct.Cl. 1 (1963) (where there is an obvious omission the contractor has a duty to inquire). The parties do not dispute that this is a construction contract, yet the language in clause 79 does not apply to construction contracts. Clause 79 refers to "end products" and their availability in "commercial quantities." 48 C.F.R. § 52.225–3.[7] These terms are not consistent with and do not apply to a constructed building. Clause 34, which is in the contract document, albeit stricken, is entitled "BUY AMERICAN ACT CONSTRUCTION MATERIALS." The stricken clause 34 refers to subpart 25.2 of the FAR which contains the sections requiring the inclusion of clause 34 in every domestic construction contract. *See* 48 C.F.R. § 52.225–5.[8]

    . . . .
    (ii) "End products" means those articles, materials, and supplies, which are to be acquired under this contract for the public use; and
    . . . .
    (b) The Contractor agrees that there will be delivered under this contract only domestic source end products, except end products:
    . . . .
    (ii) Which the Government determines are not mined, produced, or manufactured in the United States in sufficient and reasonably a [sic] *available commercial quantities* and or a satisfactory. quality. . . . [Emphasis added.]

**8.** The FAR-prescribed construction clause, which was included in the contract form, but marked out, reads in its entirety:

Finally, the Claims Court's holding that clause 34, instead of clause 79, is the appropriate and controlling provision of this construction contract accords with actions of the parties during performance of the contract. *See Sperry Corp. v. United States*, 845 F.2d 965, 970 (Fed.Cir.1988) (citing *General Warehouse Two, Inc. v. United States*, 389 F.2d 1016, 1020, 181 Ct.Cl. 180 (1967)). During performance, the parties were on notice that the construction contract clause applied. The Corps explicitly advised Amoroso that only "domestic construction materials," a term taken from clause 34, may be used and provided Amoroso with a BAA compliance memorandum explaining that all construction materials delivered to the site must be domestic. In correspondence between Amoroso and Bostrom, Amoroso iterated the Corps's interpretation. Amoroso referred to the structural steel pieces fabricated by Bostrom as "construction materials" consistent with the language in clause 34 and provided Bostrom with the BAA compliance memorandum. It also forewarned Bostrom, paraphrasing the terminology contained in clause 34, that "each item that is delivered to the site must be American made."

For the foregoing reasons the Claims Court property treated clause 34 as being a requirement of the instant contract. Our controlling precedent, *see South Corp. v. United States*, 690 F.2d 1368 (Fed.Cir.1982) (in banc) (Court of Claims decisions are binding precedent unless and until overruled by the Federal Circuit sitting in banc), so requires. *See G.L. Christian & Assoc.*, 312

F.2d at 424, 427; *SCM Corp.*, 645 F.2d at 903–04; *Chris Berg, Inc.*, 426 F.2d at 317.

C. We also are convinced that the Claims Court correctly interpreted and applied clause 34. The purpose of that clause is to ensure compliance with the BAA's statutory mandate that only domestic construction materials be used in public construction contracts in the United States. *See John C. Grimberg Co. v. United States*, 869 F.2d 1475 (Fed.Cir.1989); *John T. Brady & Co. v. United States*, 693 F.2d 1380 (Fed.Cir.1982). The only exception permitted to the BAA requirement is when an agency head, after a timely application for waiver, determines that use of only domestic construction materials would be inconsistent with the public interest or that their cost is unreasonable. *See* 41 U.S.C. § 10d; Exec.Order No. 10,582, 3 C.F.R. § 230 (1958), *reprinted in* 41 U.S.C. § 10d app. at 1042 (1982). That exception is not here involved.

Clause 34 requires that the contract be performed with "domestic construction material" including "a construction material manufactured in the United States, if the cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components." 48 C.F.R. § 52.225–5. "Construction materials" are those items "*brought to the construction site* for incorporation into the building." *Id.* (emphasis added).

In its decision, the Claims Court noted that the Armed Services Board of Contract Appeals (ASBCA) in *George Hyman Construction Co.*, ASBCA No. 13777, 69–2 BCA

34. BUY AMERICAN ACT—CONSTRUCTION MATERIALS FAR 52.225–5
  (a) The Buy American Act (41 U.S.C. 10) provides that the Government give preference to domestic construction material.
  "Components," as used in this clause, means those articles, materials, and supplies incorporated directly into construction materials.
  "Construction materials," as used in this clause, means articles, materials, and supplies brought to the construction site for incorporation into the building or work.
  "Domestic construction material," as used in this clause, means (1) an unmanufactured construction material mined or produced in the United States, or (2) a construction material manufactured in the United States, if the cost of its components mined, produced, or manu-

factured in the United States exceeds 50 percent of the cost of all its components. Components of foreign origin of the same class or kind as the construction materials determined to be unavailable pursuant to subparagraph 25.202(a)(3) of the Federal Acquisition Regulation (FAR) shall be treated as domestic.
  (b) The Contractor agrees that only domestic construction material will be used by the Contractor, subcontractors, materialmen, and suppliers in the performance of this contract, except for foreign construction materials, if any, listed in this contract.
  (The foregoing requirements are administered in accordance with Executive Order No. 10582, dated December 17, 1954, as amended, and subpart 25.2 of the FAR).

(CCH) ¶ 7830 (1969), stated that when applying the requirements of clause 34, the "state of assembly or disassembly of items upon arrival at the site of incorporation may become determinative." Subsequently, the ASBCA and the Comptroller General have regularly construed clause 34 to mean that if an item is delivered to the construction site unassembled, it is a separate item of construction material even though later combined with other items. Thus, each item of construction material brought to the site has been required to meet the BAA. *See Ed Allen L. Bender, Inc.*, ASBCA No. 38068, 89–3 B.C.A. (CCH) ¶ 22,092 (1989); *Ed Loshbaugh & Sons, Inc.*, ASBCA No. 36104, 88–3 B.C.A. (CCH) ¶ 21,023 (1988); *Swanson Prod., Inc.*, ASBCA No. 33493, 87–1 B.C.A. (CCH) ¶ 19,661 (1987); 69 Comp.Gen. 211, 212 (1990); 51 Comp.Gen. 814, 818 (1972); 46 Comp.Gen. 813, 817 (1967). The Claims Court also noted that the ASBCA decision in *Wright Contracting, Inc.*, ASBCA No. 39120, 91–1 BCA (CCH) ¶ 23,649 (1990), is almost identical factually to the present case. After considering many of the same arguments that are now made by Amoroso, the ASBCA concluded in *Wright* that each steel beam delivered to the site was required to comply with the BAA. Based on these interpretations, consistently followed by the ASBCA and the Comptroller General, the Claims Court concluded that each steel piece delivered to the construction site in this case must satisfy the requirements of the BAA.

The Claims Court's interpretation of the required FAR provision, clause 34, is not only reasonable, but also required by the plain language of that clause. The clause defines a manufactured construction material in the singular, indicating that each item must be viewed separately for its domestic content. It would strain the plain meaning of clause 34 to interpret a group of steel pieces delivered to the construction site as "*a* construction material." Moreover, construction materials are defined in clause 34 as items "brought to the construction site." Such construction materials must therefore satisfy the BAA requirements at the time of delivery to the site, not at some later time when they may be incorporated or assembled into a larger item.[9]

■ D. Finally, Amoroso contends that the cost of labor and transportation to the job site may be included in determining percentages of domestic and foreign costs of the steel pieces under the BAA. This argument is contradicted directly by the language of clause 34. Clause 34 defines a "domestic construction material" that is manufactured in the United States as one in which the "cost of its components mined, produced, or manufactured in the United States exceeds 50 percent of the cost of all its components." 48 C.F.R. § 52.225–5. "Components" are defined as "those articles, materials, and supplies incorporated directly into construction materials." Because labor and transportation costs are not "articles, materials, [or] supplies," and are not "incorporated directly into construction materials," the Claims Court correctly held that Amoroso may not include them to determine percentages of domestic and foreign costs for purposes of the BAA.

## CONCLUSION

For the foregoing reasons, the decision of the Claims Court is

*AFFIRMED.*

PLAGER, Circuit Judge, concurring.

I have no difficulty with the result reached in this case. Amoroso understood that the contract expressly contained a 'Buy America' provision. Amoroso also understood, despite the fact that the drafters had inserted the wrong version of the provision in the contract, what a 'Buy America' provision required in the context of a construction contract.[1] That Bostrom, Amoroso's subcon-

---

9. Treating a construction material delivered to the site as merely a component of a larger unit thereafter constructed would entail a difficult analysis and decision. Amoroso contends that the larger unit in this case for assessing BAA compliance should be the group of pieces making up the steel skeleton of the building. In another case, however, it might be argued that the building skeleton plus walls and roof should be the proper unit to use.

1. On that point this case is distinguishable from the problem faced by Rembrant (sic), the painter,

tractor, failed to comply even after direct instructions from Amoroso is a problem between Amoroso and Bostrom, not between Amoroso and the Government. Whether viewed as a matter of contract interpretation in light of all the circumstances, or as one of promissory estoppel, Amoroso loses.

Unfortunately the opinion of the panel does not stop there; it provides an alternative explanation based on the so-called *Christian* doctrine. That case, *G.L. Christian and Associates v. United States*, 312 F.2d 418, 160 Ct.Cl. 1 (1963), *aff'd on reh'g*, 320 F.2d 345, 160 Ct.Cl. 58 (1963), had a unique set of facts, and the court fashioned a special remedy. Those facts are not presented in this case, and there is no need to invoke a special remedy. There are well established doctrines available to a court for equitably adjusting the rights and duties of contracting parties. As a general proposition, these doctrines permit a court to construe a contract in light of the behavior and presumed intent of the contracting parties. The so-called *Christian* doctrine is not among these recognized techniques, and should be limited to the special circumstances that called it forth, for three reasons.

First, unlike traditional contract doctrines, the *Christian* doctrine is not tied to the intent of the parties. Although it admittedly provides less than certainty, judicial attention to the intent of the parties circumscribes the interpretation of contracts, and thereby provides contracting parties with a modicum of predictability. Instead, the *Christian* doctrine would have courts interpret cases by invoking an abstract notion of a "significant or deeply ingrained strand of public procurement policy" (*see e.g.* op. at 1076; *G.L. Christian and Associates v. United States*, 312 F.2d 418 at 426 (Ct.Cl.1963)), a standard that can be tied to anything or nothing, and is therefore inherently unpredictable.

The purpose of the *Christian* doctrine, furthermore, does not appear to be the resolution of disputes among parties to contracts, but rather the protection of the Legislative Branch from encroachment by the Executive Branch (*see e.g.* op. at 1076; *G.L. Christian and Associates v. United States*, 320 F.2d 345 at 351 (Ct.Cl.1963)). The Federal Acquisition Regulations (FAR), authorized by law and issued by the Executive Office of the President through the Office of Federal Procurement Policy, are addressed to government agencies and intended to bring about some degree of internal consistency in agency procurement policies. That agencies occasionally misapply or fail to follow the FAR is a cause for closer administrative supervision and a never-ending source of cases such as this. It seems unlikely, however, that such occurrances will rise very often to the level of a challenge to the authority of Congress under Article I of the Constitution. Expanding the *Christian* doctrine to establish a general rule that we pick and choose among these regulations and the statutes that authorize them on the basis of the depth of their policy 'ingrainedness' is overkill, and will prove to be an exercise in verbal gymnastics at best.

Second, the Government when contracting with the private sector for goods and services enjoys the same contractual rights and remedies as do all others. In addition, by virtue of its dominant role in the marketplace, the Government routinely grants itself privileges—like the right to terminate a contract for the Government's convenience without penalty—that are not available to other contracting parties, and indeed would rarely if ever be seen in an arms-length contract between private parties. I see no reason for gratuitously granting the Government an even more favored position in its contract activity, and one based on abstract notions of 'public policy'; to do so smacks more of autocratic rule than freedom of contract.

Third, the *Christian* doctrine in effect grants the Government authority, without liability, to change its mind post-performance about what a contract was intended to require on the grounds that some provision, which was omitted intentionally or negligently, would, if present, have granted the Government valuable contract rights. Given that power in the government, parties contracting

---

who I thought should not have had to paint the walls to the letter of the contract rather than the requirements of the building. *Wright Construc-* *tion Co. Through Rembrant, Inc. v. United States*, 919 F.2d 1569 (Fed.Cir.1990) (Plager, J., dissenting).

**1080**

with the Government will in time factor in the additional cost of the risk of loss attributable to such possible governmental action. Absent predictable contract rights, the market will either refuse to participate, or, more likely, simply increase the price of participation. The Government may save some money in the short run under this principle of "I know my contract rights when I see them," but in the long run the public who pay the costs will be the losers.

The Government is amply protected in a case such as this by traditional contract doctrines governing rights and remedies, and as the court correctly held, under those doctrines the Government wins. The discussion and extension of *Christian* to this case is neither necessary nor desirable; it should not be taken as reflecting the unanimous view of the court.