MARYLAND PORT ADMINISTRATION *v.*
C. J. LANGENFELDER & SON, INC.

[No. 543, September Term, 1981.]

*Decided January 11, 1982.*

The cause was argued before MASON, WILNER and WEANT, JJ.

*Scott Livington, Assistant Attorney General,* and *Robert B. Harrison, III, Assistant Attorney General* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellant.

*Jon F. Oster* and *J. Roy Thompson, Jr.,* with whom were *William B. Somerville* and *Smith, Somerville & Case* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

On June 21, 1978, the Maryland Port Administration (MPA), an administrative unit within the State Department

of Transportation (DOT), entered into a contract with C. J. Langenfelder & Son, Inc. (Langenfelder) for dredging work in the Baltimore harbor. The agreement permitted MPA to make certain types of changes in the work, but provided that if any such change made by MPA caused an increase or decrease in Langenfelder's cost, "an equitable adjustment shall be made." A similar "equitable adjustment" was provided for in the event subsurface or latent physical conditions at the site differed materially from those indicated in the contract and caused an increase or decrease in the contractor's cost.

During the course of the work, Langenfelder filed three claims for additional compensation under these "equitable adjustment" clauses, one (MDOT 1003) being by reason of an MPA change order and two (MDOT 1000 and 1006) arising from different site conditions. In accordance with the "Disputes" clause of the contract, after MPA rejected the claims the disputes were submitted to the Department's Board of Contract Appeals for resolution.

On August 15, 1980, the Board rendered a decision in the three matters. It made an "equitable adjustment" of $39,415 in No. 1000, $42,893 in No. 1003, and $48,476 in No. 1006, all in Langenfelder's favor. With respect to each of these adjustments, the Board added "predecision" interest at what it deemed to be the "legal rate" — 6% per annum to June 30, 1980, and 10% per annum from July 1 to August 15, 1980; [1] and it provided that "post decision" interest would accrue at the rate of 10% per annum. The "predecision" interest thus established amounted, in the aggregate for all three claims, to $6,296.

MPA promptly paid the principal amounts awarded on Nos. 1000 and 1006 ($87,891), but it declined to pay the adjustment on No. 1003 or any interest — pre- or post-decision — on any of the claims. Instead, apparently acting under the State Administrative Procedure Act (Md.

---

[1]. By Acts of 1980, ch. 798, effective July 1, 1980, the General Assembly provided that "the legal rate of interest on a judgment shall be at the rate of 10 percent per annum on the amount of judgment." *See* Md. Code, Courts article, § 11-107.

Code art. 41, § 244, *et seq.)* it took an appeal to the Baltimore City Court, asking that the contested parts of the Board's awards be reversed. Langenfelder moved to dismiss the appeal, contending that MPA had no right of judicial review of the Board's decisions.

Ultimately, the court decided that (1) MPA did have the right of judicial review under the Administrative Procedure Act, but (2) the Board's decisions, both as to the adjustment in No. 1003 and as to the allowance of interest, were correct. MPA acquiesced in the decision as to No. 1003 by paying the principal amount of $42,893, but it still objects to the allowance of interest, and has appealed that determination. In a defensive move, Langenfelder has taken a cross-appeal, pressing the issue of whether MPA had a right to judicial review in the first place. Since the issue raised by Langenfelder is jurisdictional in nature, we shall address it first.

### (1) *Right of MPA to Judicial Review*

Maryland Rule B3 provides that an administrative appeal may be taken "by a person now or hereafter authorized by statute to appeal." Langenfelder contends that there is no statute authorizing MPA to take an appeal from a decision of the Board of Contract Appeals, and therefore the right of appeal does not exist. MPA, on the other hand, sees such authority in the statute creating the Board.

To resolve this question, some preliminary comments are in order. MPA, as we have noted, is part of DOT, being one of the five administrations within that Department.[2] The Department is headed by the Secretary of Transportation who, as the chief executive officer of the Department, is "responsible for the operation of the Department." Md. Code, Transportation article (hereafter "Trans. art.") § 2-102(b)

---

**2.** The other principal administrations forming part of DOT are the State Aviation Administration, the Mass Transit Administration, the State Highway Administration, and the Motor Vehicle Administration. There are a number of other units — boards and commissions — also included in the Department. *See* Md. Code, Transportation article, § 2-107.

(2). In addition to a number of specific duties, he is authorized to "establish guidelines and procedures to promote the orderly and efficient administration of the Department," *(id.)* to transfer or assign any power or duty "from any unit in the Department to his office," (Trans. art. § 2-103 (f)) and to "establish, reorganize, or abolish areas of responsibility in the Department. . . ." (Trans. art. § 2-102 (b) (2).) With exceptions not relevant here, he may "exercise or perform any power or duty that any unit in the Department may exercise or perform." (Trans. art. § 2-103 (g).)

When the original contract was signed, there was no Board of Contract Appeals (BCA) in existence; that Board was created by Acts of 1978, ch. 418, which took effect July 1, 1978 — ten days after the contract was executed.[3] Section 3 of the Act made clear that the Act was to be prospective only, and was to have no "effect upon or application to any contract entered into prior to [its] effective date. . . ." The contract, drawn in accordance with the law then current, made no mention of BCA. It provided that any dispute "concerning a question of fact" that could not be resolved by agreement between the contractor and the MPA engineer would be submitted to the MPA Administrator. His decision would be final and conclusive unless, within thirty days, the contractor filed an appeal to the *Secretary.* "The decision of the Secretary," said the contract, "shall be final and conclusive" as to issues of fact, although "[n]othing in this Contract . . . shall be construed as making final the decision of any administrative official or representative on a question of law."

Keeping in mind that MPA is a unit of DOT subject to the overall authority of the Secretary, it would appear from that provision that, as to MPA, the ultimate decision of the Secretary would have been final and binding, both on issues of fact and on issues of law. Although the *contract* left open the possibility of an appeal on issues of law, there was no provi-

---

**3.** The Act had already been passed by the General Assembly, and was signed into law by the Governor on May 16, 1978; but Section 3 delayed its effective date to July 1, 1978.

sion in the *law* for a subordinate unit of the Department to challenge the Secretary's final decision in court. As to Langenfelder, however, it was bound only by the Secretary's determinations of fact; it was free to challenge his conclusions of law, both under the contract and under Md. Code art. 41, § 255 (a), part of the Administrative Procedure Act.

By ch. 418, however, the General Assembly sought to provide a different way of resolving contract disputes between DOT agencies and their contractors. It did this by enacting a new subtitle 6 to title 2 of the Trans. art., which:

(1) created BCA as a unit within DOT, its three members to be appointed by the Governor upon recommendation by the Secretary and with the advice and consent of the Senate (§§ 2-601, 2-602);

(2) empowered BCA to "hear and determine all disputes within its jurisdiction" (§ 2-603 (a));

(3) vested BCA with "jurisdiction over all disputes other than labor disputes arising under a contract with the Department, or as a result of a breach of a contract with the Department" (§ 2-603 (b));

(4) directed BCA to "issue a final decision in writing on each dispute submitted," with a copy to be mailed to the Secretary "and to each party to the dispute" (§ 2-603 (c));

(5) required BCA to adopt rules and regulations providing for the "informal, expeditious, and inexpensive resolution of claims and controversies" (§ 2-603 (d)); and

(6) provided that "[t]he Administrative Procedure Act shall apply to proceedings under this subtitle" (§ 2-604).

Shortly after the new law took effect, the parties amended their contract to take advantage of it.[4] On September 11,

---

4. Although, as noted, § 3 of the Act provided that contracts entered into prior to July 1, 1978, were not subject to the Act, there was no apparent bar to the parties' amending such a contract to make the Act applicable by agreement. See the preface to the regulations adopted by BCA (COMAR 11.06.01), indicating that disputes arising under contracts entered into before July 1, 1978, would not be within BCA jurisdiction "absent an agreement between the parties providing for the jurisdiction."

1978, they agreed upon a new "Disputes" clause which, in effect, substituted BCA for the Secretary. The relevant change, in that regard, was in the sentence providing that the decision of the MPA Administrator would be final and conclusive unless, within thirty days, "the Contractor mails or otherwise furnishes a written appeal to the Department of Transportation Board of Contract Appeals." The new clause, though generally substituting BCA for the Secretary, did not track the repealed language providing that the Secretary's determination was to be "final and conclusive" with respect to issues of fact, or the express reservation of the contractor's right to challenge administrative determinations on issues of law. Nothing was said in the new clause about the finality or conclusiveness of BCA decisions, as to fact or law.

In challenging MPA's asserted right of judicial review of BCA's decisions, Langenfelder argues that (1) there is nothing in the BCA law specifically affording that right, and (2) the general application of the Administrative Procedure Act under § 2-604 does not suffice because MPA is not an "aggrieved party" entitled to appeal under art. 41, § 255. It bases the latter contention on a line of cases beginning with *Maryland Board of Pharmacy v. Peco, Inc.,* 234 Md. 200 (1964), which, it suggests, establish that quasi-judicial administrative agencies are not "aggrieved" parties under § 255 and therefore have no right to appeal from decisions not to their liking.

We think that Langenfelder has misconstrued what the Court of Appeals said and held in *Peco* and its progeny.

To put the issue in a proper perspective, we start with *Board of Zoning Appeals v. McKinney,* 174 Md. 551 (1938), where the Court concluded that a zoning board had no authority to appeal from a court order reversing its decision to grant a building permit. The Court's rationale was essentially as follows:

(1) The board was one of those types of administrative agencies exercising a quasi-judicial function:

"It grants or withholds highly valuable privileges accordingly as it from evidence finds the existence of facts which justify one course or the other. It has no executive duties, it formulates no policies, its function is merely to find facts, to apply to those facts rules of law prescribed by the Legislature, and to announce the result. *It has no interest, personal or official, in the matters which come before it other than to decide them according to the law and the proved fact, and it is in no sense a party to such proceedings." (Id.* at 560-61; emphasis supplied.)

(2) As a creature of statute, the board had only those powers explicitly or implicitly conferred on it by the Legislature; and, unlike certain other agencies, "its nature and character preclude the hypothesis that the Legislature intended that it should have the power to engage in litigation involving the legality or propriety of its decisions." *(Id.* at 562.)

(3) Apart from legislative authority, the Board had "no more right to appeal from its own decisions to the Baltimore City Court, or, from the decisions of that court to the Court of Appeals, than a justice of the peace, or such an agency as the State Industrial Accident Commission [*i.e.,* the Workmen's Compensation Commission], would have to appeal from judgments of a court reversing their decisions." *(Id.* at 562.)

The essence of this is that an administrative agency is not ordinarily a party in interest *with respect to the quasi-judicial proceedings it conducts or the quasi-judicial decisions it renders,* and it therefore cannot be considered as legally "aggrieved" if a court reverses or modifies one of those decisions. Absent that status of "aggrievement," it has no right to appeal the court's judgment unless the Legislature has otherwise conferred that right upon it.

In *Peco,* the Court merely applied that same rationale to preclude the State Pharmacy Board from appealing a court order reversing its denial of Peco's application for a permit

to open a pharmacy. The concepts enunciated in *McKinney* and applied in *Peco* have been reaffirmed and reapplied many times by the Court of Appeals, and are well entrenched in the law. *See, for example, Board of Liquor License Commissioners v. Leone,* 249 Md. 263 (1968); *Real Estate Commission v. Tyler,* 268 Md. 641 (1973), and, more recently, *Employment Security Administration, Board of Appeals v. Smith,* 282 Md. 267 (1978).

Most of the cases in this area follow the *Peco* pattern, of an administrative agency attempting to appeal to an appellate court from the order of a trial court reversing or modifying a quasi-judicial decision made by the agency. There have been at least two "wrinkles" in that pattern, however, which are urged upon us as significant.

In *Board of Examiners of Landscape Architects v. McWilliams,* 270 Md. 383 (1973), the Court faced the question of whether the Board of Examiners, a unit within the Department of Natural Resources, had standing to appeal a decision of the departmental Board of Review. The Board of Examiners, a licensing agency, had denied two applications for licenses to practice landscape architecture. The disappointed applicants appealed to the Board of Review, which reversed those denials and, in effect, directed the Board of Examiners to issue the licenses.[5] The Board then sought judicial review in the circuit court.

Applying *Peco,* the Court of Appeals held that the agency had no right to judicial review. Implicit in that holding was that the agency's role in the appeal to the Board of Review and its interest in the outcome of that proceeding were no different than if the applicants' appeal had been to the circuit court. It got back to the basic proposition that when an agency exercises a quasi-judicial function, as explicated in *McKinney,* it is not a party to the proceeding before it or before an appellate body authorized to review its decision,

---

**5.** The Board of Review was authorized to hear and determine appeals from the decisions of any unit within the Department that were subject to judicial review. *See* Md. Code, Natural Resources article, § 1-106 (c); former art. 41, § 236 (c).

and it has no judicially cognizable interest in what happens to that decision. Absent some special statutory authorization, therefore, it does not have the right to appeal the judgment or determination of the appellate body, to protect *its own decision*.[6]

The second offshoot was *Subsequent Injury Fund v. Pack,* 250 Md. 306 (1968), where the question was whether the Subsequent Injury Fund could appeal from an award made against it by the Workmen's Compensation Commission. The Court recognized that this was not the normal *Peco*-type situation, where the agency sought to protect its own administrative decision — that, unlike zoning and liquor boards, "the Subsequent Injury Fund does have a direct interest in the outcome of the hearing, *viz.* the Commission is authorized to award the claimant compensation from the Fund, which award might possibly be the result of an erroneous application of the Workmen's Compensation Law." *Id.* at 310.

The Court also noted, however, that "there is a very real distinction between being *aggrieved* by a decision, and having a status cognizable in law as able to present a grievance." *Id.* The problem was that the Fund was not a legally constituted " 'person' "; "[i]t is actually nothing more," said the Court, "than a glomerate of money, to be disbursed by the State Treasurer on written orders of the Commission. It is not supervised, maintained or protected by a governing board, which is given the authority to appeal. . . . Nor is it an agency of the State, created and designated as such by the Legislature. . . . It is not a commission, corporation, trustee or other artificially created 'person.' " *Id.* at 311. Because the Fund was not a "person" and had been given no special right of appeal, it did not have that right.[7]

---

**6.** By resting its decision on the *Peco* rationale, the Court was not obliged to consider (and did not consider) whether, as a constituent and subordinate unit within the Department, the Board of Examiners was competent in any event to challenge the determination of the Board of Review, which the law declared to be the "final unit decision" for the Department. *See* Md. Code, Natural Resources article, § 1-107(2).

**7.** The General Assembly promptly conferred the right of appeal. Acts of 1969, ch. 394 (Md. Code art. 101, § 66 (5)).

The situation before us here is quite different than any of those presented in the aforecited cases. We are not dealing with an agency (MPA) that is (1) quasi-judicial in nature, or (2) seeking to protect or vindicate its own quasi-judicial decision. As with the case of the Subsequent Injury Fund, it has a direct pecuniary interest in awards made by BCA; but, unlike the Fund (as it existed in 1968), MPA is a "person." It is created as a State agency; it has a governing structure; and it is given very substantial duties to perform. Among those duties (and powers) conferred upon it by Trans. art., title 6, are to rehabilitate, improve, and maintain port facilities (§ 6-204 (i)); to "do anything necessary to promote and increase commerce within its territorial jurisdiction" (§ 6-204 (f)); to make "any contract necessary for or incidental to the performance of its duties" (§ 6-208); to appear in its own behalf before any agency of the Federal Government or any State in any matter that relates to a project maintained by it (§ 6-204 (m)); to "do anything else necessary or convenient to carry out [its] powers" (§ 6-204 (o)); and, most significantly, to *"sue and be sued in its own name"* (emphasis supplied; § 6-204 (b)).

By reason of these differences, we find the *McKinney-Peco-McWilliams* rationale to be inapposite and the critical element missing in the *Subsequent Injury Fund* decision to be present here. MPA was not only interested in and "aggrieved" by the decision of BCA, but, in contrast to the Subsequent Injury Fund, it had a status in the law which enabled it to "present a grievance."

The inapplicability of the *McKinney-Peco-McWilliams* rationale does not necessarily settle the matter however. The question still remains of whether the Legislature has authorized MPA to appeal BCA decisions to court. We think that it has conferred that authority.

We begin not with the BCA law, as urged by MPA, but the law governing MPA. Clearly, the authority noted above to enter into contracts, to sue and be sued, and to do anything necessary or convenient to carry out its powers would imply the power to litigate contract disputes. What occurred here,

initially, is that MPA voluntarily gave up that right by agreeing in its contract to submit all disputes to its superior administrative official — the Secretary. As we pointed out, MPA's inability to challenge the Secretary's decision did not arise from any inherent lack of authority to litigate but rather from the fact that, by virtue of his overriding authority as head of the Department, the Secretary's position with respect to any dispute superseded that of MPA. The agency position *vis a vis* the contractor was established by the Secretary, and MPA, as a subordinate body, was no more competent to challenge it than a lieutenant is competent to challenge the decision of the general. That is not a matter of "right to sue," but only of executive organization and management.

The amendment to the contract, coupled with the enactment of ch. 418, brought about a significant change in that situation. No longer was the dispute to be resolved (administratively) by an official superior in authority to MPA. The BCA was a quasi-judicial, fact-finding, unit, exercising no executive authority over MPA. It was designed to remove these disputes from the jurisdiction of the Secretary and to present them, for administrative resolution, to a more neutral arbiter having no executive authority over either party.

That change, it seems to us, freed MPA from the constraints that it had voluntarily accepted in the initial contract, and brought back into play and permitted it to exercise the full panoply of powers granted to it in its own law including its right, as an aggrieved party, to take an administrative appeal from a BCA decision adverse to it. We see nothing in the BCA law (ch. 418) that would serve to restrict those powers.[8]

---

**8.** Ch. 418 began as Senate Bill 576. As originally proposed by DOT, it permitted any party aggrieved by a BCA decision, including DOT, to appeal directly to the Court of Special Appeals. When the bill was actually introduced, however, that had been changed to authorize an appeal to the Circuit Court for Anne Arundel County. In its first reader form, the bill provided that the Administrative Procedure Act "shall not apply to proceedings under this subtitle." In lieu of that, it adopted the Federal scheme, derived from the "Wunderlich Act" (Title 41 U.S.C. §§ 321, 322) and provided that the BCA decision on any issue of *fact* would be final and conclusive unless

For these reasons, we believe that MPA did have the right, under the Administrative Procedure Act (art. 41, § 255), as a "party aggrieved by a final decision in a contested case," to seek judicial review.[9]

## (2) *Allowance of Interest*

We turn now to the substantive issue of whether BCA was correct in awarding predecision and postdecision interest at the rates indicated. Four subsidiary questions are subsumed in this issue: (a) is MPA's liability for such interest barred by the doctrine of sovereign immunity; (b) is predecision interest permissible under the contract as part of an "equitable adjustment"; (c) is BCA authorized to make an

---

fraudulent, arbitrary, capricious, so grossly erroneous as to imply bad faith, or unsupported by substantial evidence. Decisions of law were not binding at all. *See* internal DOT memorandum dated June 30, 1977 (System for Resolving Contract Disputes).

The Senate Finance Committee amended the bill to permit an appeal to *any* circuit court or to the Baltimore City Court, and with that amendment (and others not relevant here) the bill passed the Senate. The House Ways and Means Committee stripped out of the bill all the language dealing with appeals from BCA decisions (both as to the Department and as to the contractor), and, in lieu thereof, provided that the Administrative Procedure Act (which, of course, provides for judicial review) "shall apply to proceedings under this subtitle." The House adopted that amendment *(see* House Journal (1978), p. 3978), and the Senate ultimately concurred in it.

The record before us gives no indication of the purpose of the House Amendment, and several contradictory inferences could be drawn from it. *See Automobile Trade Association of Maryland, Inc. v. Insurance Commissioner.* 292 Md. 15, 24 (1981). It could be argued, for example, that deletion of the language specifically providing the right of appeal to DOT agencies evidenced an intent that such right should not exist, but it is equally arguable that, by making the Administrative Procedure Act, with the right of review provided by it, applicable, the General Assembly saw the deleted language as unnecessary.

It is not for us to speculate on the matter. The Administrative Procedure Act does provide for the right of judicial review to a person aggrieved by an agency decision, and we have concluded that MPA was such an aggrieved person.

**9.** The procedure for resolving contract disputes involving State agencies has been substantially modified since this dispute arose. As part of the new State procurement law (Md. Code, art. 21), effective July 1, 1981, BCA was abolished and replaced by the State Board of Contract Appeals. *See,* in particular, art. 21, §§ 7-201 — 7-203. Section 7-203 provides that the decisions of the new Board, which is an independent agency not part of any. department, are subject to judicial review, and that "any aggrieved party, including a State agency, may appeal a final decision or part thereof."

award of postdecision interest; and (d) was it permissible for BCA to use the 10% rate from and after July 1, 1980? Because the 10% rate was applied to both predecision and postdecision interest, we shall deal with the fourth sub-question as part of our examination of (b) and (c).

### (a) *Sovereign Immunity*

In 1976, the General Assembly enacted a statute designed to waive the State's defense of sovereign immunity in actions based on written contracts. Acts of 1976, ch. 450 (now codified as Md. Code, art. 21, § 7-101; formerly, art. 41, § 10A). It provided, in relevant part, that:

> "Unless otherwise specifically provided by the laws of Maryland, the State of Maryland, and every offi-cer, department, agency, board, commission, or other unit of State government may not raise the defense of sovereign immunity in the courts of this State in an action in contract based upon a written contract executed on behalf of the State, or its department, agency, board, commission, or unit by an official or employee acting within the scope of his authority."

The Act went on to provide that in any such action the State and its agencies would not be liable for punitive dam-ages, that claims would be barred unless suit was filed within one year, and that, "[i]n order to provide for the implementation of this section, the Governor annually shall provide in the State budget adequate funds for the satisfaction of any final judgment, after the exhaustion of any right of appeal, which has been rendered against the State [or its agencies] in an action in contract as provided in this section." Md. Code, art. 21, § 7-104.

MPA does not ignore the existence of ch. 450; nor does it suggest that Langenfelder's claim is not within its general purview. It is an action *ex contractu* based on a written contract, and is not barred by the special statute of limi-tations. Instead, MPA argues that there is a tacit or implicit

limitation in the statute not apparent from its plain language — that it "provided for a limited waiver of the defense of sovereign immunity, but did not expose the State to liability for interest."

We find absolutely no basis for such a contention. Nowhere in the statute or its legislative history is there the slightest evidence of an intent by the General Assembly to allow the defense of sovereign immunity to bar the imposition of interest on a claim against the State, where such interest is otherwise permissible.[10] The General Assembly was well aware of the problem of overbreadth and the possible fiscal impact of a waiver upon State agencies. It therefore *did* limit the scope of the waiver. It restricted the waiver to written contracts and to actions filed within one year; and it expressly precluded punitive damages. Had it intended to retain the State's immunity against the imposition of interest, it easily could have done so, exactly as it did with respect to punitive damages.

### (b) Predecision Interest: Contractual Right — *Equitable Adjustment*

Predecision interest in this case (commencing from November 26, 1979) was allowed as part of the equitable adjustments made pursuant to the contract, and it is in that context that we must consider it.

---

**10.** For a succinct legislative history of ch. 450, including earlier efforts by the Legislature to waive the defense of sovereign immunity, *see* Report of the Governor's Commission to Study Sovereign Immunity (Nov., 1976), pp. 100-01; App. B-1 — B-25. In 1974, the Legislature passed House Bill 5, which was a much broader waiver in contract actions, but it was vetoed because of its breadth and because there was no mechanism in it for paying judgments. In 1975, the General Assembly tried again by passing House Bill 1672. That bill provided a funding mechanism, but was still somewhat broad. It did not, for example, preclude punitive damages. The Governor again vetoed the measure, but reconstituted a long-dormant Task Force to study sovereign immunity. Ch. 450 was, in large measure, the work product of that Task Force, a fact recognized in the preamble to the Act. The interim report of the Task Force, rendered on February 2, 1976 (*see* Report, *supra*, App. J) recommended the bill subsequently enacted, but nowhere in that interim report is there any suggestion that the defense should be retained to the extent of barring interest on contract claims.

The concept of "equitable adjustment" is relatively new to Maryland, but it has a long history in Federal procurement. *See General Builders Supply Co., Inc. v. United States,* 409 F.2d 246 (Ct. Cl. 1969). It is part of — and to some extent the *quid pro quo* for — an arrangement whereby the contractor agrees not to stop work when a dispute arises, but to proceed in accordance with the Government's directives, reserving for administrative resolution the question of how much, if anything, it is entitled to as a result of the changed conditions. The function of an "equitable adjustment," in that regard, was aptly described in *Bruce Construction Corporation v. United States,* 324 F.2d 516, 518 (Ct. Cl. 1963):

> "Equitable adjustments in this context are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract. Since the purpose underlying such adjustments is to safeguard the contractor against increased costs engendered by the modification, it appears patent that the measure of damages cannot be the value received by the Government, but must be more closely related to and contingent upon the altered position in which the contractor finds himself by reason of the modification."

Describing "equitable adjustment" as intended to "keep a contractor whole" is a lot easier than determining what it takes to do that. With respect to predecision interest, BCA regarded it as akin to and serving the same functions as prejudgment interest awarded by a court — "to compensate the aggrieved party for the loss of the use of the principal liquidated sum found due it and the loss of income from such funds." *I. W. Berman Properties v. Porter Brothers, Inc.,* 276 Md. 1, 24 (1975). It is more appropriate, however, to view it as compensation for the cost of financing the additional work required to be performed.

The Federal experience, though generally of great relevance in dealing with the concept of "equitable adjustment," is not particularly helpful when it comes to the question of predecision interest because that aspect has

consistently been controlled either by statute or special procurement policy.

Until 1978, the governing statute was Title 28 U.S.C. § 2516, which expressly disallowed interest on a claim against the United States unless the contract or an Act of Congress provided for its payment.[11] By virtue of that statute, unless provided for as part of the procurement regulations (and thus by contract), the Federal tribunals were ordinarily precluded from considering recompense for the *cost of* extra money expended by a contractor — in the form of predecision interest — in the same context as other types of non-labor, material, or equipment costs. It was simply forbidden.

Gradually, Federal procurement policy began to change. In 1954, the Department of Defense adopted a new policy which allowed as part of an equitable adjustment interest costs on money borrowed to finance Government change orders. That was restricted, however, to "where a contractor actually paid the interest and could prove that the borrowing was forced or otherwise made necessary by the changed work." *Dravo Corp. v. United States,* 594 F.2d 842, 846 (Ct. Cl. 1979); *see also Framlau Corporation v. United States,* 568 F.2d 687 (Ct. Cl. 1977); *Bell v. United States,* 404 F.2d 975 (Ct. Cl. 1968). A distinction was thus drawn between the use of borrowed funds, for the cost of which compensation was allowed, and the use of the contractor's own capital, for the cost of which it was not. It was a distinction that the Court of Claims found "artificial" and which served to reward "thin capitalization," but it was followed nonetheless. *See Framlau Corporation v. United States, supra,* 568 F.2d at 695.

In 1976, the Defense Department removed that distinction, at least in part, by adding to its procurement

---

11. The statute, as drawn, applied only to cases before the U.S. Court of Claims, but by judicial decision it was extended to the District Courts as well, the theory being that it was merely expressive of the "common law" principle that by reason of sovereign immunity (unless waived), interest does not run against the United States. *See United States v. 106.64 Acres of Land,* 264 F.Supp. 199 (D. Neb. 1967).

contracts a clause providing for predecision interest, without regard to any borrowing by the contractor. *See* 32 CFR 7-104.82 (1979). Two years later, Congress removed the bar of the old statute (§ 2516). As part of the new Contract Disputes Act of 1978 (92 Stat. 2383, *et seq.;* Title 41 U.S.C. § 601, *et seq.*), it provided that "[i]nterest on amounts found due contractors on claims shall be paid to the contractor from the date the contracting officer receives the claim . . . from the contractor until payment thereof." (§ 611). That provision carried forth a recommendation of the Federal Commission on Government Procurement; its rationale, according to the Report of the Senate Governmental Affairs and Judiciary Committees (Senate Report No. 95-1118), 95th Cong., 2d Sess., reprinted in [1978] U.S. Code Cong. & Ad. News 5235, was as follows:

> "The rights of Government contractors who prevail on claims against the Government are unique since they have been required by language of the contract, for example, the changes article and the disputes article, to perform the work as directed by the Government without stopping to litigate. Thus, Government contractors must perform and then argue about the amount of the equitable adjustment at some later time. Since the contractor has been compelled to perform the work with its own money — in the total absence of contract payments or progress payments — there can be no equitable adjustment to the contractor until the contractor recovers the entire cost of the additional work. The cost of money to finance this additional work while pursuing the administrative remedy, normally called interest, is a legitimate cost of performing the additional work." *Id.* at 5266.

*See also Brookfield Construction Co., Inc v. United States,* 661 F.2d 159 (Ct. Cl. 1981).

By reason of these changes, so long as the contract is subject to the new Act (or the new procurement regulations) and all procedural requirements are met, predecision inter-

est, as a method of compensating the contractor for the cost of money employed in carrying out the Government's directives, is routinely allowed. *See Brookfield Construction Co., Inc. v. United States, supra; Blackhawk Heating & Plumbing Co., Inc. v. United States,* 622 F.2d 539 (Ct. Cl. 1980); and *cf. Monroe M. Tapper & Associates v. United States,* 611 F.2d 354 (Ct. Cl. 1979), and *Everett Plywood Corporation v. United States,* 651 F.2d 723 (Ct. Cl. 1981).

Maryland has no counterpart to either of the Federal statutes (Title 28 U.S.C. § 2516 or new Title 41 U.S.C. § 611) or to the procurement regulations noted above. Its administrative and judicial tribunals are therefore not subject to the same legal constraints that bind (and bound) their Federal counterparts. Predecision interest is neither required nor forbidden as a matter of law.

The underlying object, as we have seen, is to make a contractor "whole," to safeguard him against increased costs engendered by the modification *that he is forced to complete.*[12] In that regard, the comment of the Senate Committees with respect to the Contract Disputes Act is apposite — that there can be no equitable adjustment until the contractor recovers the entire cost of doing the extra work, and that the cost of money to finance that additional work is a legitimate cost of the work itself. That is true whether the cost of the money is in the form of interest paid on borrowed funds or the loss of income on the contractor's own capital invested in the additional work. We therefore think that compensation for such a cost — the cost of money — is an appropriate element in calculating an "equitable adjustment," and that the allowance of that cost may be expressed in the form of predecision interest.

Finally, MPA attacks the method by which the predecision interest was calculated, contending that BCA

---

12. The "Disputes" clause of the contract here provided that "[p]ending any decision by the Board of Contract Appeals of a dispute hereunder, the Contractor shall proceed diligently with the performance of the Contract and in accordance with the decision of the [MPA] Administrator or his duly authorized representative."

erred in using the 10% rate after June 30, 1980.[13] Its argument is that, under Md. Const., art. III, § 57, the "legal" rate of interest in Maryland is 6% per annum unless provided otherwise by the General Assembly, and that the General Assembly has not, for cases such as this, provided otherwise. To the extent that BCA relied on Courts article, § 11-107, establishing 10% as the legal rate on money judgments, it erred, says MPA, as that section applies only to judgments rendered by a court.

We agree with MPA that § 11-107, which speaks in terms of a "judgment," has no application to awards (or adjustments) made by BCA, but we do not agree that the 10% rate applied by BCA for the six-week predecision period, though apparently based on an erroneous construction of § 11-107, was itself erroneous.

The amount in question here is almost *de minimis,* but we shall address the issue nevertheless. The problem is one of semantics. Although denoted and calculated as "interest" — a percentage rate applied on an annual basis to a fixed amount — predecision interest is intended to compensate the contractor for an actual cost that he has sustained. If, for example, the contractor had been required to borrow money at 12% to finance the additional work, absent some statute, regulation, or contractual provision to the contrary,[14] it would have been permissible for BCA to allow the predecision interest at that rate. The adjustment, it must be kept in mind, is to be an "equitable" one; the recompense, as nearly as possible, is to be actual, and not necessarily by reference to an artificial rate that may have little relevance to the contractor's actual cost of money.

---

**13.** We note in passing that paragraph SGP-4.03 permitted Langenfelder to include in a claim for equitable adjustment an amount, not to exceed 20% of its extra labor, material, and equipment cost, for "overhead and profit." Langenfelder in fact added that 20% to all three claims and it was allowed in full. No one has raised the question of whether recompense for the cost of funds employed in financing the extra work is part of an "overhead" cost subject to the 20% maximum or, conversely, is in the nature of a direct cost. We therefore shall not consider that question. Maryland Rules 1031 and 1085.

**14.** *Compare* Title 41 U.S.C. § 611 and 32 CFR § 7-104.82 establishing a method for determining the rate of predecision interest.

When viewed in that sense, predecision interest is not really interest at all; it is a cost element that, for the sake of convenience, is simply calculated in the manner of interest. In attacking the BCA allowance, MPA has the burden of showing how it was incorrect; *i.e.*, that Langenfelder's cost of money was less than the predecision interest actually awarded. It has not done so, and for that reason we shall not disturb the award.

(c)   Postdecision Interest —

*Authority of BCA*

MPA argues that BCA has only the powers conferred upon it by statute, and that nowhere in the statute is there the authority to award postdecision interest. *Ergo,* it says, BCA has no such power.

We agree that BCA was competent to exercise only those powers conferred upon it by law, but we think that the allowance of postdecision interest is included within those powers.

An administrative agency is generally regarded as having not only the powers expressly conferred by its enabling statute, but also "those powers which are necessarily, or fairly or reasonably, implied as an incident to the powers expressly granted." 1 Am. Jur. 2d, *Administrative Law,* § 44 (1962). *See also id.* § 73; 73 CJS *Public Administrative Bodies and Procedure,* § 50 (1951). We think that the authority to impose postdecision interest is one of those implied powers.

BCA was established to exercise a special type of quasi-judicial function — to adjudicate a class of contract disputes that, in most cases, would necessarily result in an award of money, a determination that the State owes the contractor or the contractor owes the State a specific sum of money. Its adjudicatory function in that regard lay somewhere between that of an arbitration panel and that of a court, both of which may, without specific statutory or

contractual authority, award postdecision interest.[15] To deny that power to BCA would have made its ability to carry out its legislatively imposed function of resolving claims and controversies incomplete, and we do not think that the General Assembly intended that to be the case. Accordingly, we believe that BCA did have the implied authority to award postdecision interest.

In awarding the postdecision interest, BCA also applied the 10% rate, apparently relying on Courts article, § 11-107. Here, we think it did err. As we have observed, that section applies only to judgments rendered by a court. The "legal" rate for BCA awards is 6%.

For the reasons expressed herein, we shall affirm the judgment of the Baltimore City Court except with respect to the postdecision interest allowed by BCA. As to that, we shall remand the case for an appropriate modification under Maryland Rule B 13.

> *Judgment affirmed except as to postdecision interest; case remanded to Baltimore City Court for modification in accordance with this opinion; costs to be divided equally between appellant and cross-appellant.*

---

**15.** With regard to the implied authority of arbitrators to provide for interest on monetary awards, *see Harsen v. Board of Education,* 333 A.2d 580 (N.J. Super. 1975); *In re Burke,* 102 N.Y.S. 785 (A.D. 1907), *aff'd* 84 N.E. 405 (N.Y. 1908).