HAVENS STEEL COMPANY,
Appellant,

v.

RANDOLPH ENGINEERING
COMPANY, Appellee.

No. 85–1800.

United States Court of Appeals,
Eighth Circuit.

Submitted March 12, 1986.

Decided March 9, 1987.

Kevin E. Glynn, Kansas City, Mo., for appellant.

Paul L. Waldron, Washington, D.C., for appellee.

Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and HARPER,* Senior District Judge.

JOHN R. GIBSON, Circuit Judge.

Havens Steel Company appeals from the district court's [1] judgment awarding Randolph Engineering Company $105,599.11 for the cost of capital used to pay additional expenses caused by Havens' breach of contract. *Havens Steel Co. v. Randolph Eng'g Co.*, 613 F.Supp. 514, 541–42 (W.D. Mo.1985). Havens argues that Randolph failed to prove to a reasonable certainty the

---

* The HONORABLE ROY W. HARPER, Senior District Judge for the Eastern and Western Districts of Missouri, sitting by designation.

1. The Honorable Ross T. Roberts, United States District Judge for the Western District of Missouri.

amount and the cost of capital used to finance the additional work. We affirm.

Havens entered a contract to fabricate and erect certain steel components to be used in the expansion of a cement plant owned and operated by Medusa Cement Company. Havens subcontracted with Randolph to perform the erection portion of Havens' contract. After the cement plant was completed, Havens and Randolph disputed their respective contractual obligations. Havens filed a complaint in the district court, alleging breach of contract and seeking declaratory relief and damages. Randolph filed a counterclaim alleging that Havens interfered with its work, causing delays and extra work, thus causing Randolph to incur additional expenses.

After a bench trial, the district court found for Randolph on all liability claims and on the majority of Randolph's counterclaims for damages. Our only concern in this appeal is with the district court's finding in favor of Randolph on its damage claim for cost of capital.[2] In this counterclaim, Randolph sought to recover the interest on the capital Randolph used to finance the additional expenses associated with the delays and extra work caused by Havens. Havens does not dispute the district court's finding that Havens' breach of contract forced Randolph to pay over $188,000 in additional costs.[3] Havens contends, however, that Randolph failed to introduce sufficient evidence to prove either the amount of money it borrowed or the interest it paid for the money used to pay these expenses.

■ Havens first argues that the evidence was insufficient to support the district court's conclusion that Randolph's cost of capital is recoverable under Missouri law[4] either as ordinary contract damages or under the theory that the contract contained an "equitable adjustment" provision.[5] The district court reasoned that Randolph could recover ordinary contract damages for the cost of its capital by proving *either* the cost of borrowing additional funds or the cost of using its own capital. *Havens Steel Co.*, 613 F.Supp. at 541–42 (citing *Maryland Port Admin. v. C.J. Langenfelder & Son, Inc.*, 50 Md.App. 525, 438 A.2d 1374 (1982)). Gene Vogan, one of Randolph's project managers, testified that Randolph borrowed under a continuing line of credit to finance its work on the Medusa project. He testified that while other projects were also financed out of Randolph's single line of credit, the amount

---

2. Disputes concerning the district court's other findings challenged by Havens on appeal were settled following a Rule 2 settlement conference. *See* 8th Cir.R.App.P. 2.

3. Specifically, Havens does not dispute the district court's findings that Randolph incurred the following additional costs as a result of Havens' breach of contract: $132,694.15 for additional work resulting from "unanticipated structural interferences and job disruptions," 613 F.Supp. at 531–32; $9,208.30 for additional work relating to the "C Duct," *id.* at 532–34; $31,064.30 for additional work involved with a "misalignment of bolt holes in the duct work and expansion joints," *id.* at 534–35; and $15,688.01 for wage escalation costs, *id.* at 537–38. The district court applied the relevant interest rates and time periods to these figures to determine the amount of the cost of capital judgment. *Id.* at 542.

4. The district court found that the contract between Havens and Randolph consisted of Havens' "Purchase Order" dated March 22, 1979, and Randolph's letter dated May 9, 1979. Havens' "Purchase Order" incorporated a two-page addendum entitled "Terms and Conditions Applying to Subcontractors and/or Suppliers." The first paragraph of that addendum recites: "This agreement shall be construed according to the laws of the State of Missouri." Although the district court held that Randolph's letter of May 9, 1979 represented a counteroffer with respect to some of the terms and conditions incorporated in Havens' "Purchase Order," the choice of law provision was unchanged by Randolph's letter of May 9, 1979, and remained in full force. The district court, therefore, was correct in concluding that Missouri law governs the issues in this case.

5. Randolph's counteroffer of May 9, 1979 included the condition, among others, that if the work was delayed or postponed for any cause except that relating entirely to Randolph's fault or negligence, Randolph would be reimbursed for all resulting added costs. The district court construed this condition as the "practical equivalent of an 'equitable adjustment' provision." 613 F.Supp. at 541. Because we conclude that Randolph's losses are recoverable under ordinary contract damage principles, we do not discuss this alternative theory of recovery.

borrowed for any particular project could be ascertained from Randolph's records. Tr. at 460–66, 654–55. Based on this testimony and its finding that Randolph incurred over $188,000 in expenses resulting from Havens' breach, the district court concluded that the evidence was sufficient to prove that Randolph either borrowed money or used its own money to pay over $188,000 in expenses necessitated by Havens' breach of contract.

Under Missouri law, the existence and amount of damages must be proved with reasonable certainty. The evidence must not leave the matter to speculation, and in the event of uncertainty, the amount of estimated loss must at least be supported by the best evidence available. *E.g., Hargis v. Sample*, 306 S.W.2d 564, 569 (Mo. 1957); *Sides Constr. Co. v. Arcadia Valley R–II School Dist.*, 565 S.W.2d 761, 768 (Mo.Ct.App.1978).

■ In this diversity case, we must apply the law as we think the highest court of Missouri would, *e.g., Tucker v. Paxson Mach. Co.*, 645 F.2d 620, 624 (8th Cir.1981), and while we are not bound by the district court's interpretations, we give great weight to the decisions of the experienced district court judge on state law questions. *E.g., Northern States Power Co. v. ITT. Meyer Indus.*, 777 F.2d 405, 413 (8th Cir. 1985); *Shidler v. All Am. Life & Fin. Corp.*, 775 F.2d 917 (8th Cir.1985). We agree with the district court's conclusion that a Missouri court would apply to the present situation the reasoning articulated in *C.J. Langenfelder, supra,* and conclude that Randolph could recover damages for its cost of capital by proving that it incurred a cost by either borrowing additional money or using its own money. In Missouri, a claim for the cost of money used to pay expenses necessitated by a breach of contract is a claim for damages, not prejudgment interest. *E.g., Killian Constr. Co. v. Tri-City Constr. Co.*, 693 S.W.2d 819, 828–29 (Mo.Ct.App.1985); *Groppel Co. v. United States Gypsum Co.*, 616 S.W.2d 49, 63–64 (Mo.Ct.App.1981). We see nothing in these cases or any others brought to our attention indicating that in awarding damages a Missouri court would ignore economic reality and distinguish the cost of borrowed funds from the cost of using one's own interest-bearing capital.

Havens does not dispute the district court's finding that Randolph spent over $188,000 as a result of Havens' breach. This finding alone establishes with reasonable certainty that Randolph either borrowed additional money or used its own money to pay these expenses. Havens misses the mark with its argument that Vogan's testimony, by itself, fails to establish with reasonable certainty that Randolph borrowed additional funds to pay the costs caused by Havens' breach. While Vogan's testimony substantiates the uncontested finding that Randolph spent over $188,000 as a result of Havens' breach, it matters little to the extent it does or does not prove that Randolph borrowed funds, instead of using its own, to finance these added costs.

Havens' second argument is that there is insufficient evidence to support the district court's use of certain interest rates to calculate Randolph's cost of capital. Vogan testified that during the time Randolph worked on the Havens project, Randolph paid "1 percent over prime to borrow money," and 15% represented a fair and accurate figure of Randolph's borrowing cost. Tr. at 462. The district court found that "[t]he record contains no proof to the contrary." 613 F.Supp. at 541. It thus applied a 15% interest rate to determine Randolph's cost of capital damages for the first year following October 12, 1979, the date Randolph originally submitted to Havens its claims for extra work. *Id.* at 542. For the period beginning October 12, 1980 up to the date of judgment, the district court, "lacking any better way of calculating things," applied the "very conservative" statutory prejudgment interest rate of 9% to calculate Randolph's cost of capital. *Id.*

■ "An appellate court may take judicial notice of a fact for the first time on appeal." *Gustafson v. Cornelius Co.*, 724 F.2d 75, 79 (8th Cir.1983); *see also* Fed.R. Evid. 201(f) advisory committee's note ("judicial notice may be taken at any stage of

the proceedings, whether in the trial court or on appeal"). A prevailing rate of interest is a proper subject for judicial notice. *E.g., Simpson v. United States,* 252 U.S. 547, 550, 40 S.Ct. 367, 368, 64 L.Ed. 709 (1920) ("we take judicial notice of the fact that at the time this tax was collected four per cent. [sic] was very generally assumed to be the fair value or earning power of money safely invested"); *Transorient Navigators Co. v. M/S Southwind,* 788 F.2d 288, 293 (5th Cir.1986); *United States v. Ven-Fuel, Inc.,* 758 F.2d 741, 764 n. 20 (1st Cir.1985); *In re Lara,* 731 F.2d 1455, 1457–58 n. 1 (9th Cir.1984); *United States v. Peavey Barge Line,* 748 F.2d 395, 402 n. 15 (7th Cir.1984).[6]

■ We take judicial notice that in the year the court applied a 15% interest rate, the average prime rate was 14.8%.[7] Board of Governors of the Federal Reserve System, *Annual Statistical Digest* 159 (1979), 75 (1980). This evidentiary fact coupled with Vogan's uncontradicted testimony that Randolph paid 1% over prime for its money satisfies us that, to the extent Havens claims the interest rate applied was too high, the evidence sufficiently supports the district court's application of a 15% rate for the year following October 12, 1979.

Similarly, we take judicial notice that between October 12, 1980 and the date of the district court's judgment, the average prime rate was 14%. *Id.* at 75 (1980), 78 (1981), 81 (1982), 82 (1983), 73 (1984), 63 (1985). It would have been virtually impossible for Randolph to acquire money for less than 9% during this period. Thus, while the district court's application of a 9% rate was, as the district court conceded, "very conservative," it is supported by sufficient evidence to the extent Havens argues that Havens was prejudiced by it.

The judgment of the district court is affirmed.

6. Havens cites *SCNO Barge Lines, Inc. v. Sun Transportation Co.,* 775 F.2d 221 (8th Cir.1985), and *Ohio River Co. v. Peavey Co.,* 731 F.2d 547 (8th Cir.1984), and argues that it is inappropriate here to take judicial notice of average prime rates. Unlike those cases, however, Havens presented no evidence to contradict the facts we judicially notice.

7. The prime rate is the rate that banks charge their most creditworthy business customers on short-term loans. The average prime rate for the periods in question is an average of each day's predominant prime rate. *See* Board of Governors of the Federal Reserve System, *Annual Statistical Digest* 216 (1985).