633 A.2d 939

DEPARTMENT OF GENERAL SERVICES

v.

HARMANS ASSOCIATES LIMITED PARTNERSHIP.

No. 491, Sept. Term, 1993.

Court of Special Appeals of Maryland.

Dec. 8, 1993.

John H. Thornton, Asst. Atty. Gen., argued (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellant.

David G. Lane, argued (Timothy J. McEvoy and Venable, Baetjer and Howard, on the brief), Baltimore, for appellee.

Argued before WILNER, C.J., and BISHOP and FISCHER, JJ.

WILNER, Chief Judge.

The State Department of General Services (DGS) appeals from a judgment of the Circuit Court for Baltimore City affirming, with one modification, a decision of the Board of Contract Appeals (BCA) awarding $163,719 in extra compensation to appellee, Harmans Associates Limited Partnership. DGS complains that (1) BCA had no jurisdiction in the matter, (2) BCA and the court were wrong in awarding the extra compensation, and (3) the court was wrong in adding pre-decision interest to the BCA award when BCA had specifically rejected Harmans' request for such interest. Harmans, of

course, defends the judgment but, in addition, has moved to dismiss this appeal as not allowed by law. We shall deny the motion to dismiss, affirm the judgment in part, and reverse it in part.

## Underlying Facts

The State owned a tract of unimproved land in Anne Arundel County on which it desired to have constructed a headquarters facility for the State Highway Administration. The facility was to consist of three buildings and related storage and parking areas. Normally, the State would have proceeded to procure the services of an architect/engineer to design the facility and then, through competitive bidding, select a contractor to build it in accordance with the plans and specifications prepared by the architect/engineer. It would have financed the construction through the sale of State general obligation bonds. *See,* in general, Md.Code, State Fin. & Proc. art., §§ 13–102, 8–114.

In this instance, the State chose a different method of achieving the result, one that involved a form of "creative financing." The principal objective, we are informed, was to avoid the creation of a State "debt"—i.e., a pledge of the full faith and credit of the State—to finance the construction and yet have the interest paid on the private financing remain tax-exempt.

Through a number of agreements entered into in March and April, 1988, including a ground lease, a conditional purchase agreement, and a facility agreement, the deal was structured in the following manner. Subject to certain contingencies, the State leased the unimproved land to Harmans for a 16–year period at a rental of $1/year. Harmans designed and constructed a facility "substantially in accordance with the Conceptual Plans and Technical Specifications" that were included with the State's request for proposals. When the facility was completed, Harmans subleased the ground to the State for the remaining term of the ground lease and sold the improvements to the State in accordance with the conditional purchase

agreement. At the end of the 16–year period, the ground lease (and the sublease) will end, and the State will own both the land and the improvements free of any encumbrances.

The $10.9 million cost of construction was financed through a private sale of certificates of participation. The proceeds were deposited with a trustee and were used to pay Harmans as construction proceeded. To secure the certificates, Harmans mortgaged to the trustee its interest in the land and in the contracts with the State. The State, as "purchaser" of the facility, is required to make semi-annual payments to the trustee in amounts sufficient to pay the principal and interest on the certificates over the term of the ground lease. The State retains the right, however, to terminate its obligation to make these payments at any time, in which event the trustee has the right to take possession of the land and improvements and either to sell or operate them in order to discharge its obligations to Harmans and the certificate holders.

In November, 1989, Harmans filed with DGS two formal claims for an equitable adjustment in the contract price, each claim having several sub-parts. One claim sought $186,860 for unexpected site conditions, including excessive amounts of topsoil; the other sought $93,854 for additional work necessary to comply with directives of the fire marshal, including the installation of smoke vents. When, on May 24, 1990, the procurement officer denied those claims, Harmans appealed to BCA. In November, 1990, BCA, in a Memorandum Decision, concluded that it had no jurisdiction and, for that reason, dismissed the appeals. BCA viewed the transaction from which the claims arose as a lease of real property rather than as a construction contract, and Md.Code, State Fin. & Proc. art., § 15–211(a)(2) excepts from BCA's jurisdiction contract claims relating to a lease of real property. Harmans sought judicial review of that decision, and, in an order entered in April, 1991, the Circuit Court for Baltimore County concluded, as a matter of law, that the claims were *not* contract claims relating to a lease of real property. It therefore reversed the dismissals by BCA and remanded the case to that Board for further proceedings.

Upon the remand, BCA heard evidence bearing on what remained of the two claims.[1] In a decision filed on May 7, 1992, BCA directed a total equitable adjustment of $163,719, consisting principally of $113,329 for the soil conditions, $11,148 for service road undercuts, $6,162 for reseeding, and $31,677 for the smoke vents.

Nothing was said in the decision about pre-decision interest. In its claims, Harmans had sought interest from November, 1989, but, according to BCA, it offered no evidence at the BCA hearing regarding pre-decision interest. After some procedural skirmishing, the Circuit Court for Baltimore City directed BCA to consider Harmans' request for pre-decision interest, which had been renewed in a motion for reconsideration filed three days after DGS had filed for judicial review of the BCA decision. BCA did consider the motion but decided not to award any pre-decision interest. The case then returned to the circuit court which, on December 8, 1992, affirmed BCA except with respect to pre-decision interest. As to that, the court concluded that Harmans was entitled by law to such interest, dating from May 24, 1990—the date of the procurement officer's final decision on the claims. From an amended order dated January 5, 1993, that set the interest rate at 10%, DGS has appealed, raising the three issues noted above.

## Motion To Dismiss

Md.Code, Cts. & Jud.Proc. art., § 12–301 permits a party to appeal from a final judgment entered by a circuit court, except as provided in § 12–302. Section 12–302(a) provides, in relevant part, that "[u]nless a right to appeal is expressly granted by law, § 12–301 does not permit an appeal from a final judgment of a court entered or made in the exercise of appellate jurisdiction in reviewing the decision of the District Court, an administrative agency, or a local legisla-

---

1. Some aspects of the site conditions claim were resolved by the parties. Two parts were left—soil conditions and conditions relating to a service road undercut.

tive body." [2]   Where the action in the circuit court is thus one to review the decision of an administrative agency, no appeal will lie to this Court unless the right to take such an appeal is expressly granted somewhere in the law.

That right is found generally in the "contested case" subtitle of the Administrative Procedure Act (Md.Code, State Gov't art., title 10, subtitle 2).   It is undisputed that BCA is an "agency" within the ambit of that subtitle, and it is also undisputed that the proceeding before BCA in this case was a "contested case."   Section 10–215 of the Cts. & Jud.Proc. article entitles a party aggrieved by the final decision of an agency in a contested case to judicial review in the appropriate circuit court, and § 10–216, with two exceptions not relevant here, entitles any party aggrieved by a final judgment of the circuit court under the subtitle to appeal to this Court. [3]

---

**2.** In a technical, but to some extent jurisprudential, sense, a court does not exercise "appellate jurisdiction" when reviewing the decision of an administrative agency or legislative body.   True appellate jurisdiction is exercised only when a court reviews the orders or judgments of a lower *court*.   Actions to review the conduct and orders of Executive or Legislative bodies are in the nature of original actions, either under extraordinary common law or equity writs or upon statutory authority. That, indeed, is one of the lessons of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

It has long been common, however, to treat these kinds of actions as being in the nature of appeals and to refer to them as "administrative appeals."   Until July 1 of this year, when the Chapter 1100, Subtitle B Rules were replaced by the Title 7, Chapter 200 Rules, the Court of Appeals itself had captioned the Rules governing these proceedings as "Administrative Agencies—Appeal From."   In the new Rules, the Court has more clearly recognized that these actions are original in nature. The Rules are now captioned "Judicial Review of Administrative Agency Decisions."

We have no doubt that, in crafting § 12–302(a) as it did, the Legislature had in mind actions of this type, to review the decisions of administrative and local legislative bodies, and so we shall construe the term "appellate jurisdiction" in the manner the Legislature intended, rather than in its more narrow, but more appropriate, manner. *Cf. Levitz Furniture Corp. v. P.G. County*, 72 Md.App. 103, 527 A.2d 813 (1987).

**3.** By 1993 Md.Laws, ch. 59, the General Assembly rewrote the "contested case" subtitle of the Administrative Procedure Act.   Former §§ 10–

■ The "glitch" in this seemingly clear and express authority for DGS to pursue this appeal arises from an evident Code Revision error in the State Finance and Procurement article. To document that error, we need to recount some of the history of the BCA.

In 1978, by 1978 Md.Laws, ch. 418, the Legislature created a Board of Appeals within the State Department of Transportation, with jurisdiction to determine disputes arising from contracts, other than labor contracts, with that Department. The law governing the Board was codified in title 2, subtitle 6 of the Transportation article. Section 2–604 provided that "the Administrative Procedure Act shall apply to proceedings under this subtitle," which sufficed to invoke the judicial review sections of that Act. In 1980, by 1980 Md.Laws, ch. 775, the General Assembly generally rewrote the State procurement law, codifying it in a new article 21 of the Code. In that revision, it abolished the board created in 1978 and, in § 7–202 of art. 21, created in its place BCA, with jurisdiction to hear appeals arising from procurement disputes involving any State procuring agency. In § 7–203, the Legislature provided that the decisions of BCA were subject to judicial review "in accordance with the provisions of the Administrative Procedure Act as they relate to judicial review of contested cases."

In 1984, the State Government article was enacted as part of the on-going Code Revision process. In that article, the various provisions formerly known as the Administrative Procedure Act were divided into separate subtitles, each dealing with a separate aspect of administrative practice. They were captioned, respectively, *Administrative Procedure Act—Regulations* (subtitle 1), *Administrative Procedure Act—Contested Cases* (subtitle 2), *Administrative Procedure Act—Declaratory Rulings* (subtitle 3), and *Administrative Procedure Act—Licensing* (subtitle 4). This was done principally because there was a host of other statutes, not part of the Administra-

---

215 and 10–216 are now codified as §§ 10–222 and 10–223, respectively.

tive Procedure Act, dealing with regulations, and the Code Revision Commission and the Legislature desired to congregate all relevant statutes on that subject in one part of the Code.

In 1985, by 1985 Md.Laws, ch. 11, the Legislature enacted Division I of the State Finance and Procurement article (hereafter referred to as SFP)—the part dealing with State finance. Because it anticipated that substantive revisions to the State procurement laws would be proposed in the next session, it deferred dealing with any Code Revision of those laws and, instead, by 1985 Md.Laws, ch. 12, simply transferred without change art. 21 of the Code to become Division II of the new article. Thus, what had been art. 21, § 7–203 became SFP, § 17–203.

The anticipated substantive revision to the procurement law came in 1986 (1986 Md.Laws, ch. 840). BCA was continued in SFP, § 11–138. In § 11–139, dealing with judicial review of BCA decisions, the Legislature took account of the splitting of the Administrative Procedure Act in the State Government article and, instead of referring to that Act by name, provided that BCA decisions were subject to judicial review in accordance with the provisions of "title 10, subtitle 2 of the State Government article (Administrative Procedure Act—Contested Cases)."

In 1988, Division II of the new SFP article, as substantively rewritten in 1986, was subjected to the Code Revision process (1988 Md.Laws, ch. 48). Regrettably, in revising SFP, § 11–139 as new SFP, § 15–223, the Code Revision unit proposed, and the Legislature enacted, language stating that a decision of BCA is subject to judicial review "in accordance with § 10–215 of the State Government article." That section, it will be recalled, provides for judicial review in the circuit court. It is § 10–216 that permits appeals to this Court. Thus, by making the cross-reference more specific, the General Assembly seemingly eliminated the right of further appeal from the circuit courts, and that is the basis of Harmans' motion to dismiss.

■ There are two reasons why we reject the motion. The first is that, in construing statutes, the predominant goal is to ascertain and carry out the legislative intent, and that, although the words actually used in the statute are normally the best indicator of that intent, sometimes they are not. The "plain meaning" rule is not rigid and may, as circumstances require, have to yield to other "external manifestations" or "persuasive evidence" of a contrary legislative intent. *See Kaczorowski v. City of Baltimore,* 309 Md. 505, 514–15, 525 A.2d 628 (1987); *Motor Vehicle Admin. v. Shrader,* 324 Md. 454, 597 A.2d 939 (1991).

■ As a general rule, statutes enacted as mere code revision are presumed not to contain substantive changes unless the intent to make such changes is clear. As the Court observed in *Welsh v. Kuntz,* 196 Md. 86, 97, 75 A.2d 343 (1950):

> "[I]nasmuch as the principal function of a Code is to reorganize the statutes and state them in simpler form, changes are presumed to be for the purpose of clarity rather than for a change in meaning. Even a change in the phraseology of a statute in a codification will not as a general rule modify the law, unless the change is so radical or material that the intention of the Legislature to modify the law appears unmistakably from the language of the Code."

*See also Bureau of Mines v. George's Creek,* 272 Md. 143, 321 A.2d 748 (1974); *Collier v. Connolley,* 285 Md. 123, 400 A.2d 1107 (1979); *Swanson v. Wilde,* 74 Md.App. 57 (1988), *aff'd,* 314 Md. 80, 548 A.2d 837.

Here, in particular, there is absolutely no evidence that, in a pure Code Revision bill, the Legislature intended to abrogate the right of appeal to this Court. Indeed, there is "persuasive evidence" that such was not the case. The Revisor's Note to SFP, § 15–223, which was part of the bill, states that "[t]his section is new language derived *without substantive change* from former SF §§ 11–137(e) and 11–139." (Emphasis added.) We would regard an abrogation of the right of appeal from the decision of the circuit court to be a substantive

change in the law, and thus presume from the Revisor's Note that the Legislature did not intend such a result.

This presumption is supported by the fact that the Legislature made no corresponding change in the contested case subtitle of the State Government article. Apart from the two sections in SFP, BCA remains an agency subject to title 10, subtitle 2 of the State Government article by virtue of the provisions of that subtitle, and, as a result, parties aggrieved by judgments of the circuit court under § 10–215 remain entitled to appeal under § 10–216. We trust that the Legislature will promptly correct the Code Revision "glitch," but we do not regard the 1988 revision as affecting the jurisdiction of this Court to hear appeals from circuit court judgments reviewing BCA decisions.

### Jurisdiction Of BCA

The issue here, as we indicated, is whether the arrangement between DGS and Harmans, from which Harmans' claims arose, constitutes a lease or sale of real property. Through a combination of the definition of "procurement" in SFP, § 11–101($l$), the definition of "contract claim" in § 15–215(b) of that article, and the stated jurisdiction of BCA in § 15–211, it is clear that BCA has jurisdiction to decide a claim that relates to a procurement contract, including a contract for construction, but that it does not have jurisdiction to decide claims arising from the sale or leasing of real property.

DGS's position, as stated in its brief, is that "[t]he essence of the transaction was the creation and transfer of interests in real property, not the mere construction of a building." This position is based principally on the ground lease and sublease used to implement the arrangement. A fair consideration of the overall transaction, especially in light of the State's own request for proposals, establishes exactly the contrary, however. The "essence of the transaction" was not the creation and transfer of interests in real property but the construction of

the State Highway Administration facility. The State's request for proposals (RFP) stated explicitly:

"The solicitation is based on the following concept:

(1) The offeror shall design, construct and finance the facilities on property owned by the State.

(2) The entire improved property shall be leased to the State Highway Administration under a lease/purchase agreement, or other creative financing mechanism as may be proposed by the offeror."

The acquisition by the State of a completed facility was the sole objective of the transaction. Neither the State nor Harmans had any business interest in leasing and subleasing unimproved land. The State needed a building and Harmans, as a developer, was willing to build it; that was the heart and soul of the agreements between them. The fact that this complex arrangement, designed to avoid the creation of a State "debt," utilized a lease and sublease cannot and does not change the true nature of the arrangement.

Even if we were to give some higher regard to the property instruments, the fact would remain that at least part of the transaction involved the construction of the facility. That is what the State was paying $10.9 million for, and, more important, that is the source of Harmans' claims. The claims for unexpected site conditions and smoke vents did not arise from any lease or sublease but solely from the construction work.

For these reasons, we find that the disputes were within the statutory jurisdiction of BCA.

### Site Conditions

Harmans' claim for an equitable adjustment based on differing site conditions is based on a clause that *should* have been in the contract; DGS's defense is based on clauses that *were* in the contract. The simple question is which prevails.

As we indicated earlier, the traditional process for construction projects is for the State to select an architect/engineer to prepare detailed plans and specifications and then to select a

contractor to build the facility in accordance with those plans and specifications. In requesting proposals from contractors, the State will normally provide information, taken from test borings, regarding soil conditions. In that regard, SFP, § 13–218(b) requires that "a procurement contract for construction shall include a clause providing for contract modification if the condition of a site differs from the condition described in the specifications." The particular clause that is mandated is set forth in the procurement regulations adopted by the Board of Public Works, COMAR 21.07.02.05. It requires (1) the contractor to notify the procurement officer promptly of subsurface conditions "differing materially from those indicated in this contract," (2) the procurement officer to investigate the conditions, and (3) if the procurement officer finds that such conditions do materially so differ and cause an increase or decrease in the contractor's cost of performance, "an equitable adjustment shall be made and the contract modified in writing accordingly."

The very next regulation, COMAR 21.07.02.06, requires construction contracts also to contain a clause in which the contractor acknowledges that he has "satisfied himself as to the character, quality and quantity of surface and subsurface materials or obstacles to be encountered *insofar as this information is reasonably ascertainable from an inspection of the site, including all exploratory work done by the State, as well as from information presented by the drawings and specifications made a part of this contract."* (Emphasis added.)

Notwithstanding that both of these clauses are required by State procurement regulations to be included in every State construction contract, only the second one was included; the first was not.

Before soliciting proposals for this project, the State employed Greiner Engineering Services, Inc. to develop Conceptual Plans and Specifications, which were included with the RFP. Indeed, the Special Conditions, also made part of the RFP, required the contractor to construct the facilities "sub-

stantially in accordance with the Conceptual Plans and Technical Specifications enclosed as Exhibits I and II." Included in the drawings prepared by Greiner were 48 foundation boring logs. The bidders were informed that actual copies of the test boring logs and information regarding tests conducted on soil samples were available for examination.

Having provided this information and having required that construction be in substantial accord with the Conceptual Design and Specifications, the RFP then backed away from making any warranties as to subsurface soil conditions. In the Special Conditions attached as Schedule C to the RFP, the State said that the inclusion of the Conceptual Design and Specifications was for "informational purposes only," and that they were not to be taken as "construction documents and specifications" or as a representation as to the "technical sufficiency, or adequacy or safety of . . . the subsoil conditions involved in the project." In the section of the Special Provisions attached to Greiner's drawings dealing with subsurface exploration, reference was made to the 48 test borings, but that reference was immediately followed by the disclaimer:

"While the Owner believes the results of the test borings accurately indicate the existing soil conditions below the surface at points and planes indicated, the Owner assumes no responsibility for the actual conditions which may be encountered in the execution of the Contract. Offerors are advised to make their own subsurface investigations."

This, in turn, was followed by other statements to the effect that, if the offeror relies on the accuracy or completeness of the test borings, he does so "at his own risk," and that the information available as to underlying earth strata "must be used by the offeror at his discretion, and is not guaranteed as factual."

DGS's position is that the arrangement is not a construction contract, that, as a result, SFP, § 13–218(b) and COMAR 21.07.02.05 are irrelevant, that the provisions just noted make clear that no representations were made as to soil conditions, and that, accordingly, there is no basis for an equitable

adjustment. We have, of course, rejected the major premise of that argument by concluding that the arrangement *was* a procurement contract for construction. Still, DGS contends, even if that is the case, the specific disclaimers, which were approved by the Board of Public Works as part of its approval of the lease, conditional purchase agreement, and facilities agreement, override the differing site clause required by the statute and the regulation. *That* is the issue upon which we need to focus.

It is not uncommon for procurement statutes or regulations to require a site condition clause similar to that at issue here, for the perception is that such a clause serves the interest of both the government and the contractor. As noted in *Foster Const. C.A. & Williams Bros. Co. v. United States,* 435 F.2d 873, 887, 193 Ct.Cl. 587 (1970), the clause is designed to ameliorate the risk to contractors from unknowable subsurface conditions. When dependable information on such conditions is unavailable, bidders will either have to make their own test borings or include in their bids a contingency element to cover the risk, either of which inflates the cost to the government. By providing test borings and an equitable adjustment clause, the government can avoid that inflation. 435 F.2d at 887, the Court explained:

"The purpose of the changed conditions clause is thus to take at least some of the gamble on subsurface conditions out of bidding. Bidders need not weigh the cost and ease of making their own borings against the risk of encountering an adverse subsurface, and they need not consider how large a contingency should be added to the bid to cover the risk. They will have no windfalls and no disasters. The Government benefits from more accurate bidding, without inflation for risks which may not eventuate. It pays for difficult subsurface work only when it is encountered and was not indicated in the logs."

*See also Stock & Grove, Inc. v. United States,* 493 F.2d 629, 204 Ct.Cl. 103 (1974); *Spirit Leveling Contractors v. U.S.,* 19 Cl.Ct. 84 (1989). BCA has adopted that same line of reasoning with respect to the Maryland requirement. *See Appeal of*

*Hardaway Constructors, Inc.,* MSBCA 1249, 3 MSBCA ¶ 227, p. 42 (MICPEL, 1989).

■ Maryland has adopted the general rule that contracts are made with reference to existing law and that laws affecting particular contracts are incorporated by implication in them. *Denice v. Spotswood I. Quinby, Inc.,* 248 Md. 428, 237 A.2d 4 (1968). *See also* 17A Am.Jur.2d *Contracts* § 381. In a series of cases beginning with *G.L. Christian & Assoc. v. United States,* 312 F.2d 418, 160 Ct.Cl. 1 (1963), the Federal courts have adopted the more specific rule that, where procurement regulations adopted pursuant to statutory authority require that a contract contain a particular clause, the contract must be read as though it contained that clause, whether or not the clause was actually written in the contract. *See S.J. Amoroso Const. Co., Inc. v. U.S.,* 26 Cl.Ct. 759 (1992); *SCM Corp. v. United States,* 645 F.2d 893, 227 Ct.Cl. 12 (1981); *DeMatteo Const. Co. v. United States,* 600 F.2d 1384, 220 Ct.Cl. 579 (1979).

This approach is not only consistent with *Denice, supra,* but is necessary for a proper implementation of the State procurement laws. The General Assembly has, by law, required a site condition clause to be included in every State construction contract, presumably for the reasons noted in the *Foster Const.* case. Although the Board of Public Works has the authority, through its regulations, to draft the specific language of the clause, which it has done, neither the Board nor DGS is empowered to dispense with the clause altogether where the contract in question is a construction contract. To hold otherwise would be to permit Executive agencies to ignore the clear legislative mandate. Because we have concluded that this arrangement was a construction contract, we conclude further that the site condition clause set forth in COMAR 21.07.02.05 is effectively a part of the Harmans contract.

■ Normally, when examining a claim for equitable adjustment due to differing site conditions, two questions need to be addressed: (1) whether the site conditions were, in fact,

different from what the contractor was led to expect; and (2) whether it was reasonable for the contractor to rely on the information supplied by the government. There is no real dispute here as to the first question. BCA found that the 48 soil boring logs indicated approximately 3–6 inches of topsoil when, in fact, Harmans encountered 1.5 to 2 feet, resulting in an excess of 12,000 cubic yards of topsoil that had to be moved. That was nearly double the 13,000 cubic yards estimated in the drawings. BCA found that this "unexpected condition was dramatically different from what any of the parties expected, requiring the removal of the unsuitable material and importation of borrow to complete construction." DGS does not contest BCA's finding that this was a material difference; its argument is that, in light of the various disclaimers, Harmans was not justified in relying on the Greiner conceptual plans and specifications.

BCA found that reliance by Harmans was reasonable. It quoted with approval statements by the U.S. Court of Claims and the Armed Services Board of Contract Appeals that soil borings "are the most specific and usually the most reliable indications of subsurface conditions," that, while those borings show the conditions only in the bored hole, it is simply not practical "to drill every square inch of a proposed construction site to determine subsurface conditions," and that "[t]his fact of life has to be taken into consideration in determining what use prospective bidders can make of the boring log information furnished to them."

On this basis, BCA observed:

"The [Greiner] plans included soil boring samples which clearly indicated topsoil a contractor would reasonably expect to encounter. Based upon these borings bids resulted. The small percentage of work done to the plans by the contractor's architect in no way affected the representations by the State in providing the boring samples. Harmans had nothing to do with the preparation of the boring samples. The State offered this information in the RFP and bidders reasonably relied upon them in making their bids."

The reasonableness of Harmans' reliance on the test borings is a question of fact, to be determined from all of the circumstances, including, but not limited to, the provisions in the RFP and the various agreements. Applying normal rules of administrative law, BCA's findings of fact are entitled to deference if they are supported by substantial evidence. Here, they are.

The State's reliance, almost exclusively, on the various disclaimers noted misses two important points. The first is, if DGS really had no intention of allowing bidders to rely on those borings, why did it bother to have them made and to include them in the RFP? If prospective bidders were not permitted to rely on them in preparing their bids, what conceivable purpose did they serve? The State has informed us of no other purpose for including the boring logs in the RFP, and so we cannot conclude that BCA was clearly erroneous in finding that they amounted to representations upon which bidders reasonably could rely. Indeed, the inclusion of the clause required by COMAR 21.07.02.06 confirms the importance of the information supplied by the State. Supporting this as well is the illogic of the converse. As we indicated, the Legislature has required every State construction contract to contain a differing site condition clause. Representations with respect to site conditions are necessary to give that clause meaning. If, through its RFP, the State can disavow such representations, it can, in effect, thwart the legislative mandate.

In summary, it is apparent to us that, in using this scheme of "creative financing" to avoid the creation of a State debt, DGS has wittingly or unwittingly trampled upon some basic procurement requirements. BCA did not err in redressing that situation.

### Smoke Vents

The Building Specifications included as part of the RFP required that, in counties where statutory building codes were in effect, space offered to the State "must comply with

such codes upon delivery." Anne Arundel County, where the property was located, had a statutory building code. Prior to May 21, 1988, the county followed the 1981 version of the BOCA (Building Officials and Codes Administrators International, Inc.) Basic Building Code. Although the "conceptual" design prepared by Greiner did not show smoke vents, the 1981 BOCA Code did require them for the signal warehouse part of the facility.

On March 10, 1988, Harmans applied to the county for a building permit. The plans submitted with the application did not include smoke vents for the signal warehouse, and, on April 25, 1988, Rajan Nigam, an official with the county Department of Inspections and Permits, wrote to Harmans' architect asking, among other things, that he "[s]how how the area requirement is met per 1981 BOCA." The "area requirement" is what, in effect, would have mandated smoke vents for the signal warehouse. On April 6, 1988—nearly three weeks prior to Mr. Nigam's letter—the county adopted an ordinance replacing the 1981 BOCA Code with the 1987 BOCA Code. The 1987 Code did not require smoke vents for the warehouse. The ordinance, by its own terms, took effect May 21, 1988.

Although Harmans and its architect were at least constructively aware that, as of May 21, 1988, smoke vents would no longer be required, their only response to Mr. Nigam's letter was to amend the plans to include smoke vents for the warehouse. On May 26, Harmans' architect submitted revised construction drawings showing the vents, even though, by then, a proper response would have been that the 1981 Code was no longer in effect and that such vents were not required. On June 14, 1988, the revised plans were approved. Harmans' claim is that, although the vents were not part of the State contract and were not required by the ordinance in effect when the final plans were submitted and approved, the county followed an "in house policy" of enforcing the 1981 BOCA Code until July 1, 1988, and that, as a result, the vents *were* required as a condition to obtaining a building permit.

Although BCA rejected Harmans' reliance on the county's "in house policy" of enforcing a Code that was no longer in effect, and held instead that the county's internal policy "is not controlling," it nonetheless sustained the claim on the basis that, because the county "would not stamp [the plans] without the vents," the "smoke vent requirement constituted a change." The rationale for that result, if there is one, is at best puzzling.

Mr. Nigam testified that he inquired about the "area requirement" in April because, at that time, the 1981 Code was still in effect. He said that some undefined directive from the director of the office, which he was unable to locate, said that "new codes were to be adopted from July 1, 1988." That was the only evidence of the so-called "in house" policy. Regrettably, Harmans simply acquiesced in the March inquiry. It never challenged Nigam and never attempted to bring to the director's attention the absolute illegality of his position but instead meekly amended its plans to include an item that was no longer required. There is no indication, in other words, that, had Harmans objected and, if necessary, simply contacted the County Solicitor, the plans would not have been approved without a provision for smoke vents. The implicit finding by BCA that the plans would not have been approved after May 21, 1988 without smoke vents is unsupported by substantial evidence and is therefore clearly erroneous. The court erred in affirming that aspect of its decision.

### Pre–Decision Interest

In considering the question of pre-decision interest in the second remand from the circuit court, BCA noted that such interest was allowable, but not required, in procurement contracts, and thus was a matter of discretion. It observed that the courts have "looked to the mechanical requirements in the contract for the payment of a 'sum certain' within a definite time frame where the failure to pay is lacking legal justification in determining the award of predecision interest." Using that standard, BCA regarded Harmans' quest as "based upon the fact it took from November of 1989 until May 7, 1992

for the Board's decision to be issued" but rejoined that that delay was largely caused by the initial disagreement as to whether the transaction in question was a lease of real property or a construction contract, and that that uncertainty was caused by the manner in which both parties had structured the deal. It said:

"The record is clear. The parties both participated in the creation of the documents which in themselves created uncertainty and confusion all of which could have been avoided by simply following COMAR as to construction contracts. Despite the creativity of counsel this case has proceeded as swiftly as practicable, and the facts in this appeal do not support [Harmans'] request for pre-decision interest."

The circuit court, though recognizing that the allowance of pre-decision interest "is in the discretion of the finder-of-fact," nonetheless reversed the disallowance. Relying on *I.W. Berman Prop. v. Porter Bros.*, 276 Md. 1, 344 A.2d 65 (1975), where the Court of Appeals found the grant of pre-judgment interest "appropriate where [the] contractor performed construction work using its own funds to the advantage of the contracting party," the circuit court noted that Harmans' subcontractors had "incurred additional costs" and that they were "forced to incur those costs to meet contract deadlines and requirements." On that basis, it allowed pre-decision interest commencing from the date the procurement officer finally denied the two claims.

We believe the court erred in that determination, for several reasons. In *Md. Port Adm. v. C.J. Langenfelder & S.*, 50 Md.App. 525, 438 A.2d 1374 (1982), we considered a contractor's claim for pre-decision interest in the context of its right to an equitable adjustment. At the time, there was no statute in Maryland regarding pre-decision interest, but we noted that, in Federal procurement, such interest was allowable as part of an equitable adjustment. With that focus, we held that its function was not the same as pre-judgment interest as described in *I.W. Berman*—"to compensate the aggrieved party for the loss of the use of the principal liquidated sum

found due it and the loss of income from such funds"—but rather was "compensation for the cost of financing the additional work required to be performed." *Md. Port Adm., supra,* 50 Md.App. at 540, 438 A.2d 1374. As a result, we concluded that, though the compensation may be expressed as a percentage of that additional cost, "the recompense, as nearly as possible, is to be actual, and not necessarily by reference to an artificial rate that may have little relevance to the contractor's actual cost of money." *Id.* at 544, 438 A.2d 1374.

Under a *Md. Port Adm.* analysis, pre-decision interest would not be indicated in this case for the simple reason that Harmans offered no evidence of what its "cost of money" was. It would appear, however, that the *Md. Port Adm.* analysis is no longer pertinent. In SFP, § 15–222, the Legislature has expressly provided for pre-decision interest, in the discretion of BCA, and has specified that "[t]he rate of interest under this section shall be the rate of interest on judgments as provided under § 11–107(a) of the Courts Article." The rate has thus been fixed by statute and is no longer dependent on the contractor's actual cost of money.

The statutory change, we think, does make the principles announced in *I.W. Berman* applicable. Those principles do not justify the court's decision, however. The *I.W. Berman* Court recognized that the allowance of pre-decision interest was discretionary and that a trial court's exercise of its discretion would be reversed only where its decision "has no sound basis in law or in reason." *Id.* 276 Md. at 20, 344 A.2d 65. The Court there affirmed the allowance of pre-judgment interest where "sums certain" were clearly due to the plaintiff, and that the defendants were thus "using monies wrongfully withheld from [the plaintiff] to their own advantage during a period of spiralling interest rates." *Id.*

Here, there was a "sound basis" for BCA's disallowance. There was a legitimate dispute over Harmans' entitlement to the equitable adjustments it sought, and, indeed, we have concluded that it was *not* entitled to an adjustment for the

smoke vents. Both the dispute itself and much of the time it took to resolve the dispute arose not from any arbitrary position taken by the State but rather from the nature of the agreement that both parties crafted. BCA did not abuse its discretion in disallowing pre-decision interest.

## *Conclusion*

We do not mean to imply in this Opinion any criticism of legitimate efforts by the State to search for new and creative methods of financing public works. When it departs from traditional methods that have both a Constitutional and legislative base, however, it needs to be certain that it is not running afoul of constraints emanating from that base—that it is not squeezing a square peg into a round hole.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO CIRCUIT COURT FOR BALTIMORE CITY FOR ENTRY OF JUDGMENT IN CONFORMANCE WITH THIS OPINION; COSTS TO BE DIVIDED EQUALLY BETWEEN THE PARTIES.